IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| SAIPAN AIR, INC., <br><br> Plaintiff, <br><br> v. <br><br> DONALD A. STUKES, JEFFRY CONRY, BORIS VAN LIER, HANK TOBERT, and DOES 1–10, inclusive, <br><br> Defendants. | CASE NO. 1:12-CV-00015 <br><br> **MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' RULE 12(b)(2) MOTION TO DISMISS** |

**I. INTRODUCTION**

Defendants Donald A. Stukes ("Stukes"), Jeffrey Conry ("Conry"), and Boris Van Lier ("Van Lier") (collectively "Defendants") have moved to dismiss the First Amended Complaint ("FAC," ECF No. 2) for lack of personal jurisdiction.[1] In the FAC, Plaintiff Saipan Air, Inc. ("Saipan Air") alleges that Defendants participated in a scheme to defraud the company through a pattern of fraudulent misrepresentations and by misappropriation of the company's funds. (FAC ¶ 1.) Saipan Air brings state-law claims of fraud and unjust enrichment, and a federal claim of violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act. The motion to dismiss ("MTD," ECF Nos. 7, 8) is supported by sworn declarations of Stukes (ECF No. 9), Conry (ECF No. 10), and Van Lier (ECF No. 11). Saipan Air has filed an Opposition (ECF No. 15) and supporting declarations of Adam Ferguson ("Ferguson") (ECF No. 15-1), Steven P. Pixley ("Pixley") (ECF No. 15-2, including two exhibits attached to the Pixley

---

[1] At the motion hearing, Plaintiff's counsel conceded that Defendant Hank Tobert has not been served and announced that he will be voluntarily dismissed from the lawsuit.

1

declaration), and J. Ariel Mariano ("Mariano") (ECF No. 15-3). Defendants have filed a Reply (ECF No. 20). Having considered the papers and the oral argument of counsel at a hearing on December 13, 2012, the Court now DENIES the Motion to Dismiss in its entirety, for the reasons set forth herein.

**II.     BACKGROUND**

On a motion to dismiss, uncontroverted allegations in the complaint are accepted as true, and conflicts between the parties' affidavits are resolved in plaintiff's favor. *See Brayton Purcell LLP v. Recordon & Recordon,* 606 F.3d 1124, 1127 (9th Cir. 2010). However, allegations in the complaint that are contradicted by affidavit are not assumed to be true. *See Alexander v. Circus Circus Enterprises, Inc.,* 972 F.2d 261, 262 (9th Cir. 1992).

Saipan Air is a corporation organized under the laws of the Commonwealth of the Northern Mariana Islands ("CNMI" or "Commonwealth") and having its principal place of business in Saipan, CNMI. (FAC ¶ 4.)

Swift Air, LLC ("Swift Air"), is a limited liability company organized under the laws of Arizona. (FAC ¶ 5.)

Conry is a resident of North Carolina. At all times relevant, he was an employee of Swift Air. (FAC ¶ 6; Conry Decl. ¶ 9.)

Van Lier is a resident of North Carolina. At all times relevant, he was an employee of Swift Air. (FAC ¶ 7; Van Lier Decl. ¶ 9.)

Stukes is a resident of New York State. At all times relevant, he was an employee of ASI Advisors, LLC, and Chief Restructuring Officer for Swift Air. (FAC ¶ 5; Stukes Decl. ¶ 13.)

Saipan Air was established to fly tourists from Japan and China to the CNMI. (FAC ¶ 4.) For that purpose, it sought to enter into a charter agreement with a company qualified to provide aircraft, crew, maintenance, and insurance ("ACMI"). (*Id.* ¶ 17.) Beginning in November 2011, it sent out requests for proposals from licensed air carriers. (Ferguson Decl. ¶ 5.) One response in December 2011 came from representatives of Swift Air, including Conry and Van Lier. (FAC ¶ 20.) On April 6, 2012, after a series of telephone calls and in-person meetings over several months in the CNMI and Arizona, Saipan Air entered into a "wet lease" or ACMI charter agreement ("the Agreement") with Swift Air for the delivery of aircraft by July 1, 2012. (FAC ¶ 27.) Three days later, Saipan Air wired $900,000 as a security deposit from a bank account in Saipan to a Swift Air account in Arizona. (FAC ¶ 28.) On May 23, 2012, at Swift Air's request, Saipan Air wired an additional $376,000 to ensure timely delivery of the aircraft. (FAC ¶ 30.) About a month later, Swift Air terminated the Agreement. (FAC ¶ 34.) On June 29, 2012, Swift Air filed for bankruptcy in the United States Bankruptcy Court, District of Arizona. (FAC ¶ 35.)

**III.    DEFENDANTS' FORUM CONTACTS**

a.    <u>Defendant Conry</u>

On or about December 12, 2011, Conry telephoned Ferguson in Saipan, represented himself as the new owner of Swift Air, and told Conry that Avondale Aviation had $70 million dollars in assets available to invest in Swift Air. (FAC ¶ 18; Ferguson Decl. ¶ 6.) He followed up with several e-mails. (Ferguson Decl. ¶ 6.)

Three days later, Conry again telephoned Ferguson in Saipan. (Ferguson Decl. ¶ 7.) He reported that Van Lier would be leaving another carrier, Dynamic Air, and joining Swift Air.

(*Id.*) He told Ferguson that he would be flying to Saipan to discuss the business proposal. (*Id.*) However, Conry did not make the trip. (*Id.* ¶ 8.)

On March 16, 2012, a day after Saipan Air had initiated negotiations with Swift Air, Conry and Von Lier confirmed that Swift Air could meet Saipan Air's launch date of July 1, 2012. (Ferguson Decl. ¶ 11.)

On March 21, 2012, Ferguson traveled to Phoenix, Arizona, where he met with Conry, Van Lier, and other representatives of Swift Air. Conry and Van Lier made allegedly fraudulent representations about Swift Air's financial backing and failed to disclose a $1.6 million tax liability to the Internal Revenue Service. (Ferguson Decl. ¶ 12.)

On March 27, 2012, Conry initiated a conference call with Ferguson and the director of sales for a finance company to ensure that the aircraft needed by Saipan were locked up through a letter of intent. (Ferguson Decl. ¶ 13.)

On April 9, 2012, at the request of Conry and Van Lier, Saipan Air wired $900,000 from a bank in Saipan to a bank in Phoenix. (Ferguson Decl. ¶ 15.)

On May 23, Conry and Van Lier spoke with Ferguson about Swift Air's worsening financial situation and apologized for failing to make the deposit on the aircraft. (Ferguson Decl. ¶ 17.) In reliance their representations, Saipan Air agreed to provide a letter of credit and a cash deposit to Swift. (*Id.*) Also on May 23 and again on May 25, Conry and Van Lier assured Ferguson that Swift was on track to meet the July 1 launch date. (Ferguson Decl. ¶¶ 17, 18.)

On or about May 31, 2012, Conry called Ferguson several times and conveyed Swift Air's urgent need for a $1.5 million bridge loan in order to perform on the Saipan Air contract. (Ferguson Decl. ¶ 19.)

On or about June 20, 2012, Conry e-mailed Ferguson that Swift Air had located a new investor but still needed to retain the $1.276 million that Saipan Air had deposited. (Ferguson Decl. ¶ 20.)

Conry admits that he engaged in telephonic and electronic conversations with Ferguson in connection with the Agreement. (Conry Decl. ¶ 9.) He asserts that all his contacts with Saipan Air and its representatives were in his capacity as an employee of Swift Air. (*Id.* at ¶ 12.)

b. Defendant Van Lier

Most of Van Lier's contacts with Saipan were in conjunction with Conry and have already been noted. The following additional contacts are pertinent to the jurisdictional question.

On or about January 10–11, 2012, Van Lier flew to Saipan and, as Swift Air's Chief Operating Officer, gave a presentation to Saipan Air representatives relating to Swift Air's proposal to provide air service. (FAC ¶ 21; Ferguson Decl. ¶ 10.) Following this event, Van Lier and other defendants caused Swift Air employees to travel to Saipan, where they were housed in two Saipan hotels. (Ferguson Decl. ¶ 10.)

On March 28, 2012, Van Lier began pressuring Saipan Air to submit a security deposit. (FAC ¶ 25.) In this regard, Van Lier sent Ferguson an e-mail on March 29 and telephoned him several times over the course of the next few days. (*Id.*) On April 6, Van Lier e-mailed Ferguson that he needed funds from Saipan Air to meet roughly $1.2 million in aircraft deposits and other down payments. (FAC ¶ 26.)

On June 24, 2012, Saipan Air received a letter, dated June 21, from Van Lier stating that Swift Air was terminating the Agreement. (FAC ¶ 34.)

Van Lier admits that he traveled to the CNMI once, in January 2012, during preliminary

5

negotiations with Saipan Air on an ACMI charter agreement. (Van Lier Decl. ¶ 8.) He admits to engaging in telephonic and electronic communications with Ferguson in connection with such negotiations. (*Id.* ¶ 9.) He asserts that in all such contacts he acted as an employee of Swift Air. (*Id.* ¶ 13.)

        c.      <u>Defendant Stukes</u>

Around the end of May, 2012, Stukes contacted Saipan Air and introduced himself as a financial advisor affiliated with ASI Advisors in White Plains, New York. (FAC ¶ 32; Stukes Decl. ¶ 13.) Over the next three weeks, he was actively involved in what ultimately were unsuccessful negotiations for Saipan Air to make a $1.5 million bridge loan to Swift Air. (FAC ¶ 32; Ferguson Decl. ¶ 19; Stukes Decl. ¶¶ 10–12.) Stukes participated in multiple conference calls to Saipan relating to the bridge loan negotiations. (Ferguson Decl. ¶ 19.) Stukes knew or should have known that Swift Air would be unable to deliver aircraft for the July 1 launch date and falsely represented to Saipan Air that Swift Air could perform. (Ferguson Decl. ¶ 19.)

**IV.    LEGAL STANDARDS**

On a defendant's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, "the plaintiff bears the burden of establishing that jurisdiction is proper." *College Source, Inc. v. AcademyOne, Inc.,* 653 F.3d 1066, 1073 (9th Cir. 2011). In evaluating a Rule 12(b)(2) motion, "[t]he court may consider evidence presented in affidavits to assist it in its determination . . ." *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir. 2001). In the absence of an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Brayton Purcell LLP v.*

*Recordon & Recordon,* 606 F.3d 1124, 1127 (9th Cir. 2010) (internal citation omitted); *see also Washington Shoe Co. v. A-Z Sporting Goods Inc.,* 704 F.3d 668, 671–72 (9th Cir. 2012).

**V.     DISCUSSION**

A district court may exercise personal jurisdiction over a nonresident defendant, in the absence of an applicable federal statute, if the state long-arm statute permits it and the exercise of jurisdiction does not violate federal due process standards. *See Pebble Beach Co. v. Caddy,* 453 F.3d 1151, 1154 (9th Cir. 2006); *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir. 2004). For purposes of jurisdictional analysis, the CNMI is treated as a state. *See Dyack v. Commonwealth of the Northern Mariana Islands,* 317 F.3d 1030, 1037 (9th Cir. 2003); *also* 28 U.S.C. 1332(e).  The CNMI's long-arm statute "subjects both residents and nonresidents to the Court's jurisdiction to the fullest extent allowable under the due process standards of the U.S. Constitution." *Bank of Saipan v. Superior Court,* 2001 MP 5 ¶ 38 (referring to 7 CMC § 1101 *et seq.*).[2]  The inquiry, therefore, reduces to whether exercise of personal jurisdiction over the Defendants would comport with federal constitutional due process.

Due process is satisfied if defendants' contacts with the forum are of such quality and nature that defendants could "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).   The court must determine whether a nonresident defendant "has certain minimum contacts with [the forum] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros*

---

[2] Acts submitting a person to the jurisdiction of the Commonwealth courts include: "(1) The transaction of any business within the Commonwealth; (2) Contracting to supply goods or services within the Commonwealth; . . . (5) Causing tortious injury or damage within the Commonwealth by an act or omission done outside the Commonwealth by a person engaged in business or other acts having impact within the Commonwealth, or who derives income or revenue from supplying goods or services within the Commonwealth; . . . (7) Any act done outside the Commonwealth which causes or results in any harmful impact, injury or damages . . . within the Commonwealth[.]"  7 CMC § 1102(a).

*Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984) (internal citation and quotation marks omitted). The court's evaluation must include "all of a defendant's contacts with the forum state, whether or not those contacts involve wrongful activity by the defendant." *Yahoo! Inc. v. La Ligue Contre le Racisme e l'Antisemitisme,* 433 F.3d 1199, 1207 (9th Cir. 2006).

The Court may exercise personal jurisdiction over the nonresident Defendants if it has either general jurisdiction or specific jurisdiction. *See Boschetto v. Hansing,* 539 F.3d 1011, 1015 (9th Cir. 2008). Plaintiff Saipan Air, which bears the burden to prove jurisdiction, concedes that there is no basis to assert general jurisdiction over Defendants in the Commonwealth. The only question is whether Defendants are subject to specific jurisdiction here.

A court may exercise specific jurisdiction over a nonresident defendant "if his or her less substantial contacts with the forum give rise to the cause of action before the court." *Unocal,* 248 F.3d at 923. If a defendant is subject to specific jurisdiction on any one claim, the court may exercise jurisdiction over all related claims. *See Washington Shoe,* 2012 WL 6582345, *3; 28 U.S.C. § 1367 (supplemental jurisdiction).

The Ninth Circuit applies a three-part test to analyze a claim of specific jurisdiction over a nonresident defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir. 2004). If the plaintiff

8

satisfies the first two prongs, the defendant must "come forward with a compelling case that the exercise of jurisdiction would not be reasonable." *Boschetto,* 539 F.3d at 1016 (internal citation and quotation marks omitted). However, if the plaintiff "fails at the first step, the jurisdictional inquiry ends and the case must be dismissed." *Id*. The court considers both "the extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts." *Yahoo!,* 433 F.3d at 1210. "A strong showing on one axis will permit a lesser showing on the other. A single forum state contact can support jurisdiction if the cause of action arises out of that particular purposeful contact of the defendant with the forum state." *Menken v. Emm,* 503 F.3d 1050, 1058 (9th Cir. 2007) (citing *Yahoo!,* 433 F.3d at 1210).

Purposeful availment and purposeful direction are "two distinct concepts." *Schwarzenegger,* 374 F.3d at 802. Purposeful-availment analysis is most often used in suits sounding in contract, while purposeful direction typically applies in actions sounding in tort. *Id*. Fraud is an intentional tort. Therefore, specific jurisdiction as to the fraud claim depends on whether Defendants purposely directed their activities or consummated a transaction in the Commonwealth or with a Commonwealth resident. If the court has specific jurisdiction over Defendants on the fraud claim, it may exercise supplemental jurisdiction over them on the related RICO claims.

      a.    *Purposeful Direction*

When evaluating purposeful direction, the court applies an "effects" test based on *Calder v. Jones,* 465 U.S. 783 (1984). See *Yahoo!,* 433 F.3d at 1206; *see also Dole Food Co. v. Watts,* 303 F.3d 1104, 1111 (9th Cir. 2002). The effects test imposes three requirements: "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3)

causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo!,* 433 F.3d at 1206. It is not required that "all (or even any) jurisdictionally relevant effects have been caused by wrongful acts." *Id.* at 1208. To survive the effects test, a plaintiff must sustain its burden on each of the test's three parts. *Schwarzenegger,* 374 F.3d at 807 n.1. The test must be applied to each Defendant separately. *See Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.,* 328 F.3d 1122, 1130 (9th Cir. 2003).

1. <u>Intentional Act</u>

For purposes of the first part of the effects test, an intentional act is "an external manifestation of the actor's intent to perform an actual, physical act in the real world, not including any of its actual or intended results." *Washington Shoe,* 704 F.3d at 674 (Arkansas store's purchase of boots from China was intentional act in copyright infringement claim brought in Washington State); *see also Schwarzenneger,* 374 F.3d at 806 (Ohio dealership's placement of advertisement in Ohio newspaper was intentional act in misappropriation claim brought in California). Each of the Defendants in this case committed intentional acts. Conry and Van Lier, at various times over the course of seven months, contacted Saipan Air's Ferguson by telephone and e-mail. Van Lier traveled to Saipan and made a presentation to Saipan Air here. Stukes contacted Ferguson repeatedly, over the course of about three weeks, in connection with a bridge loan for Swift Air. It makes no difference whether the Defendants intended to defraud or otherwise harm Saipan Air. It is sufficient that each Defendant intended to perform the physical acts themselves.

//

//

10

2. <u>Express Aiming</u>

To sustain specific jurisdiction, it is not enough that the intentional acts have foreseeable effects in the forum state. *Bancroft & Masters,* 223 F.3d at 1087. They must be expressly aimed at the forum state. *Id.* The "express aiming" requirement "is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Id.* When defendants, at the time of the alleged conduct, "knew that [plaintiff corporation's] principal place of business was in [the forum state], knew that the decisionmakers for [plaintiff corporation] were located in [the forum state], and communicated directly with those [forum state] decisionmakers, . . . their actions were 'expressly aimed' at the forum state." *Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1112 (9th Cir. 2002) (express aiming of conduct at California by foreign defendants who allegedly induced California corporation to lease warehouse space in the Netherlands on unfavorable terms). Defendants Conly, Van Lier, and Stukes knew, when they negotiated the Agreement with Ferguson and tried to arrange financing, that Saipan Air was a CNMI resident.

Moreover, in intentional torts, acts are expressly aimed at the forum when they "are performed for the very purpose of having their consequences felt in the forum state . . ." *Brainerd v. Governors of the University of Alberta,* 873 F.2d 1257, 1260 (9th Cir. 1989). "Knowledge that an intentional act will have an impact in another state" is a common thread in cases where express aiming has been found. *Washington Shoe,* 704 F.3d at 677; *cf. Schwarzenegger,* 374 F.3d at 807 (no express aiming where Ohio dealership did not know that impact of placing advertisement in local newspaper would be felt in California). Clearly, each of

11

the Defendants knew that the outcome of their various negotiations with Saipan Air would be felt in the CNMI. Therefore, their acts were expressly aimed.

### 3. Harm

For purposes of the effects test, a corporation suffers "jurisdictionally sufficient economic harm" in the forum state "when a forum in which a plaintiff corporation has its principal place of business is the same forum toward which defendants expressly aim their acts." *Dole Food,* 303 F.3d at 1114. Defendants knew that Saipan Air was a start-up company looking to bring tourists and investors to the CNMI, and that the effects of a failure of Saipan Air would be felt directly in the CNMI. Defendants knew that the brunt of the harm from any tortious conduct would be felt in the CNMI.

In their declarations, Defendants emphasize that they acted in their capacity as employees of Swift Air, not in their personal capacity. This circumstance does not change the analysis. Defendants' "status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum must be assessed individually." *Calder v. Jones,* 465 U.S. 783, 790 (1984). In *Calder,* a celebrity sued the *National Enquirer* newspaper and two of the *Enquirer*'s employees – a reporter and an editor – for libel. They were not insulated from suit in their personal capacities in California even though their acts were arguably within the scope of their employment. Neither are the Defendants here shielded from the exercise of jurisdiction if they were acting on behalf of Swift Air.

b. *"Arising Out Of"*

To determine whether a claim arises out of forum-related activities, courts in the Ninth Circuit rely on a "but for" test. *See Ballard v. Savage,* 65 F.3d 1495, 1500 (9th Cir. 1995). The

12

"but for" test "preserves the requirement that there be some nexus between the cause of action and the defendant's activities in the forum." *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 385 (1988), *rev'd on other grounds,* 499 U.S. 585 (1991). Here, but for Defendants' activities in responding to Saipan Air's request for proposal and soliciting Saipan Air's business, the causes of action would not have arisen.

      c.     *Reasonableness*

Defendants, who live on the East Coast of the U.S. mainland, assert that it is unreasonable to haul them thousands of miles across the Pacific Ocean to remote Saipan to defend this lawsuit. Because Plaintiff Saipan Air has met its burden on the first two prongs of the test for specific jurisdiction, the burden is on Defendants to overcome the "presumption of reasonableness . . . by presenting a compelling case that jurisdiction would be unreasonable." *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir. 1986); *see also Burger King Corp. v. Radzewicz,* 471 U.S. 462, 476–78 (1985).

To decide whether the exercise of personal jurisdiction over Defendants is reasonable, the Court must balance the relative significance of seven factors:

    (1) The extent of purposeful interjection into the forum state;
    (2) The burden on the defendant of defending in the forum;
    (3) The extent of conflict with the sovereignty of defendant's state;
    (4) The forum state's interest in adjudicating the dispute;
    (5) The most efficient judicial resolution of the controversy;
    (6) The importance of the forum to plaintiff's interest in convenient and effective relief;
    (7) The existence of an alternative forum.

*Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 840 (9th Cir. 1986). The aim of this seven-factor analysis is to determine whether "under the totality of the circumstances the

defendant could reasonably anticipate being called upon to present a defense in a distant forum." *Id.* (quoting *Taubler v. Giraud,* 655 F.2d 991, 993 (9th Cir. 1981)).

Here, Defendants purposefully interjected themselves into the CNMI. They made telephone calls and sent e-mails to Saipan. Conry and Van Lier solicited wire transfers from Saipan. Stukes tried to arrange for a bridge loan from Saipan. Purposeful interjection may be problematic in cases when negligence in one state is alleged to have caused injury in another. *See, e.g. Insurance Co. of North America v. Marina Salina Cruz* ("*ICNA*"), 649 F.2d 1266 (9th Cir. 1981) (negligent repairs in Mexican shipyard allegedly caused ship to sink in Alaska waters). Here, however, the cause of action is an intentional tort, involving allegations of purposeful misconduct. Conry and Van Lier interjected themselves by responding to Saipan Air's request for proposals. Stukes interjected himself by contacting Saipan Air to try to arrange a bridge loan.

Defendants assert that the burdens on them of defending in the CNMI are extreme. They point out that "in the law of personal jurisdiction, the defendant's burden is of primary concern." *ICNA,* 649 F.2d at 1272. The burdens on a defendant "are of particular significance if . . . the defendant has done little to reach out to the forum state." *ICNA,* 649 F.2d at 1272. This is particularly so when the forum state is at a great distance from home. *See Powerhouse Diesel Services, Inc. v. Tinian Stevedore, Inc.,* 1993 WL 377437 (D.N.M.I. Sept. 15, 1993). In *Powerhouse Diesel,* this Court found that it lacked specific jurisdiction over a Texas company that had packaged a diesel engine sold by a California corporation for transport to the CNMI. *Id.* at *1. The engine was damaged when it fell during land transfer from the port of Tinian, in the CNMI, to a power plant on the island. *Id.* The Texas company's contact with the CNMI was

limited to its knowledge that the final destination was Tinian. *Id.* at *2. The company had "engaged in no affirmative conduct which allowed or promoted the transaction of business within the CNMI; it merely packaged an engine for shipping." *Id.* Its allegedly tortious acts amounted to no more than "untargeted negligence." *Id.* at *3 (quoting *Calder,* 465 U.S. at 789). In contrast, Defendants Conry, Van Lier, and Stukes purposefully reached out to Saipan Air in the CNMI and their alleged tortious conduct was intentional. The great distance of Saipan from the U.S. mainland was not an undue obstacle for Defendants when they wished to pursue a business opportunity in the CNMI. It should not be an undue burden for them, then, to defend a lawsuit arising from their purposive conduct in Saipan.

As to conflict with or affront to the sovereignty of Defendants' home states, Defendants do not assert that any exists, and none is apparent.

The CNMI's interest in adjudicating this dispute is high. Plaintiff is a CNMI citizen, incorporated and headquartered in the Commonwealth. The CNMI has an interest in affording its citizens a forum for redress of grievances. The Commonwealth's economy is almost wholly dependent on tourism and foreign investment, which Saipan Air's venture held out promise of promoting.

Defendants assert that the CNMI is not the most efficient forum for this litigation, and that alternative forums are available – not only Defendants' home states of New York and North Carolina, but also Arizona. They point out that Swift Air has filed for bankruptcy in Arizona and assert that evidence necessary to resolve this dispute already exists in the bankruptcy proceeding. (MTD Memo. at 17–18.) They observe that Saipan Air is actively involved in litigating in Arizona in the Swift Air bankruptcy. (*Id.* at 19.)

It may seem intuitive that it is more efficient to keep all the Swift Air–related litigation within Arizona. However, efficiency for this litigation should not be confused with convenience for Defendants. Saipan Air is compelled to seek relief against Swift Air in Arizona, within the bankruptcy proceeding, by operation of the automatic stay in bankruptcy law. The evidence is not a large piece of machinery located outside the forum like the engine in *Powerhouse Diesel,* which had been transported back to California. *See* 1993 WL 377437 at *4. It consists of documents – e-mail correspondence and wire transfers – and the testimony of witnesses who are not centralized in one location. In addition to Ferguson and the Defendants, it would be expected that other employees of Swift Air in the U.S. mainland and Saipan Air in Saipan might be required to testify.

At the hearing on the MTD, counsel for Swift Air argued that because Arizona is in the same circuit as the Commonwealth (the Ninth Circuit), Plaintiff would not be disadvantaged in Arizona by having to learn another circuit's case law. Although this may be so for the federal RICO claims, a federal court must apply CNMI law to the fraud claim that is the focus of this jurisdictional analysis. As such, the District of the Northern Mariana Islands is better situated than the District of Arizona.

On balance, Defendants have not presented a compelling case that it would be unreasonable to make them defend this claim in the CNMI. Under the totality of the circumstances, especially their frequent and intentional contacts with Saipan over the course of many months, they could reasonably anticipate having to defend themselves in a court in the Commonwealth on allegations arising from those contacts.

//

## VI. CONCLUSION

Because each of the Defendants purposefully availed himself of the privilege of conducting activities in the CNMI, Plaintiff's fraud claim arises out of and relates to those activities, and the exercise of jurisdiction in the CNMI comports with fair play and substantial justice, the Court finds that it has specific personal jurisdiction over each of the Defendants.

Furthermore, because the Court has jurisdiction over Defendants on the fraud claim, it may exercise supplemental jurisdiction over them on the related RICO claims. Therefore, it is unnecessary to determine whether an alternative basis for jurisdiction exists in 18 U.S.C. § 1965(b), which establishes nationwide service of process in RICO claims.

Defendants' Motion to Dismiss for lack of personal jurisdiction is DENIED.

SO ORDERED this 25th day of February, 2013.

/s/ RAMONA V. MANGLONA
RAMONA V. MANGLONA
Chief Judge