UNITED STATES DISTRICT COURT
DISTRICT OF NORTHERN MARIANA ISLANDS
CIVIL ACTION NO. CV-12-00015

| | |
|---|---|
| SAIPAN AIR, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| DONALD A. STUKES, JEFFREY | ) |
| CONRY, BORIS VAN LIER, HANK | ) |
| TOBERT and DOES 1-10, inclusive, | ) |
| | ) |
| Defendants. | ) |

DECLARATION OF BORIS VAN LIER

Boris Van Lier, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.

2.     I am a citizen of the Netherlands and current resident of the State of North Carolina.

3.     In January 2012, I traveled to Saipan to meet with representatives of Saipan Air to discuss Swift Air, LLC's ("Swift Air") interest in providing lift service for the Saipan Air program.

4.     At the time, I believed that Swift Air would be able to obtain Federal Aviation Authority ("FAA") support to allow Swift Air to provide the necessary aircraft to sustain the Saipan Air program.

5.     Subsequently, on January 19, 2012, I informed Adam Ferguson of Saipan Air, via e-mail, that Swift Air would not be able to provide lift service for the Saipan Air program. As a result, Swift Air and Saipan Air parted amicably. A true and correct copy of that e-mail is attached as **Exhibit A**.

6.     Later, in March 2012, negotiations between Saipan Air and Swift Air started anew because Swift Air believed it had the capacity to provide lift service for the Saipan Air program.

7.     On March 21, 2012, Adam Ferguson traveled to Phoenix, Arizona to meet with Swift Air representatives.

8.     At the March 21, 2012 meeting, Swift Air made available to Adam Ferguson numerous financial statements including balance sheets, P&Ls, cash flow statements and various pro formas.

9.     Adam Ferguson only requested to see the pro formas relating to the Saipan Air program and made no request to see any of the other financial statements Swift Air was ready to make available to him.

10.     At no time during my conversations with Adam Ferguson did I knowingly misrepresent to him information about Avondale Ventures or other investors for Swift Air, LLC.

11.     At no time did I provide Adam Ferguson with Swift Air, LLC financial statements that contained inaccuracies or falsities with respect to Swift Air, LLC's financial condition.

12.     Following that March 2012 meeting, Swift Air and Saipan Air began negotiations relative to an ACMI Charter Agreement for the Saipan Air program.

13.     During the negotiations of the ACMI Charter Agreement between Saipan Air and Swift Air, there was no agreement with respect to the allocation of the initial $900,000.00 security deposit other than as provided for in the ACMI Charter Agreement.

14.     I informed Adam Ferguson that the security deposits contemplated by the ACMI Charter Agreement would not be escrowed.

15.     Swift Air and Saipan Air executed the ACMI Charter Agreement on or about April 6, 2012. A true and correct copy of the ACMI Charter Agreement is attached as **Exhibit B.**

16.     Pursuant to the International Lease Finance Corporation ("ILFC") Letter of Intent with Swift Air, only $176,000.00 was required to be deposited with ILFC immediately following execution of the ACMI charter agreement. A true and correct copy of the ILFC Letter of Intent is attached as **Exhibit C**.

17.     Swift Air tendered to ILFC the required $176,000.00 pursuant to the terms of the ILFC Letter of Intent.

18.     At all times following execution of the ACMI Charter Agreement with Saipan Air, Swift Air, LLC was ready, willing, and able to perform under the terms of that agreement until such time Saipan Air was made aware of financial changes with Swift Air, LLC.

19.     Following execution of the ACMI Charter Agreement, Swift Air took extensive efforts to prepare for the July 1, 2012 start date of the Saipan Air program.

20.     Specifically, Swift Air hired and trained eight (8) pilots to crew the first aircraft for the Saipan Air program. Frank Truskolaski, Swift Air's Chief Pilot, informed Adam Ferguson of this training via e-mail on May 28, 2012. A true and correct copy of this e-mail is

attached as **Exhibit D**. Six (6) additional pilots were ready and available to support the Saipan Air operation as needed.

21.     Further, Swift Air contacted the Federal Aviation Management Office on March 29, 2012 via letter to formally request Swift Air's OPS SPECS be amended to reflect the addition of a Boeing 757-200 aircraft. A true and correct copy of this letter is attached as **Exhibit E**.

22.     In April, 2012, Swift Air issued a Services and Material Order to Boeing for the purchase of a Flight Crew Operations Manual and Quirk Reference Handbook for a Boeing 757-200 aircraft. A true and correct copy of the signed order is attached as **Exhibit F**.

23.     On April 4, 2012, Swift Air entered into a Technical Services Agreement with Wingspan Aero, LLC to develop a Maintenance Inspection Program for a Boeing 757-200 aircraft. A true and correct copy of this Technical Services Agreement is attached as **Exhibit G**.

24.     In April, 2012, Swift Air contracted with Sky Aerospace Engineering, Inc. to provide consulting services and records review services for Swift Air related to the Boeing 757-200 aircraft.

25.     On June 7, 2012, Swift Air contacted the Federal Aviation Management Office via letter to inform them that Swift Air's manual submission for the Saipan Air program was complete. A true and correct copy of this letter is attached as **Exhibit H**.

26.     On May 22, 2012, as a result of changing financial conditions within Swift Air which would prevent Swift Air from continuing to support the Saipan Air program without adequate additional funding, I provided Adam Ferguson with Swift Air 2012 financial documentation including income statements, a balance sheet and a cash flow statement. A true and correct copy of that e-mail is attached as **Exhibit I**.

27.     Those financial statements illustrated the precarious financial position that Swift Air faced as of May 2012 and accurately reflected extensive liabilities including $1.7M of long term federal transportation tax liability.

28.     Following receipt of these financial statements, Saipan Air elected to continue its relationship with Swift Air and caused a wire from Tan Holdings Corporation to be sent to Swift Air on May 29, 2012 in the amount of $376,000.00.

29.     My compensation and travel reimbursements from Swift Air were agreed upon obligations of Swift Air pursuant to the terms of my employment with Swift Air and existed prior to Swift Air's relationship with Saipan Air.

30.     At no time did I misappropriate funds from Saipan Air for my own personal benefit.

31.     At no time did I receive any alleged bonus payment from Swift Air.

32.     Beginning in February 2012, Swift Air began using my personal credit cards as a source of funding to continue business operations due to Swift Air only having a single corporate credit card.

33.     During this operative period, the physical credit cards were in the possession of Swift Air and I had no oversight as to the various travel, catering, fuel and ground handling charges that were being made on the credit cards.

34.     Swift Air would later reimburse me for charges incurred by Swift Air on those credit cards.  Over the course of Swift Air's usage of my credit cards, I was reimbursed approximately $800,000.00 for charges incurred by Swift Air or for the benefit of Swift Air.

35.     To the best of my knowledge, Swift Air, LLC was operated in accordance with all corporate formalities.  I never co-mingled any corporate funds, obligations, or used any corporate assets for my individual benefit.

36.     I declare under penalty of perjury that the foregoing is true and correct.

[Remainder of page left intentionally blank]

Further Declarant Sayeth Not

Dated: September 24, 2014

_____

Boris Van Lier

**From:**      Adam Ferguson [adferguson1@me.com]
**Sent:**      Wednesday, January 18, 2012 7:46 PM
**To:**        Boris Van Lier
**Cc:**        Jeff Conry; George Chiu; Jerry Tan
**Subject:**   Re: Attempted call


Thanks for your response Boris.
Good luck with Swift Air.

Regards,
Adam

On Jan 19, 2012, at 10:37 AM, Boris Van Lier wrote:

> Adam,
>
> We talked to the FAA this week and discussed our proposed agenda. As
> you might imagine, they will never come out and tell you that they can
> support you, nor will they indicate that they cannot support any
> initiatives, but I strongly doubt that we will be able to get the
> level of support conforming two additional aircraft and adding the 757
> to Swift' OPS SPECS. I remain convinced that internally we could be
> successful, but I am not willing to jeopardize your program in the
> event we are unsuccessful in accomplishing a full certification by
> June 15,
> 2012 due to a lack of FAA support.
>
> I thank you for your hospitality and patience and wish you success in
> the new venture.
>
> Sincerely,
>
> Boris van Lier
> Chief Operating Officer
> Swift Air, LLC
> 2710 East Old Tower Road
> Phoenix, AZ 85034
> Phone  +1 (866) 277-9438
> Mobile +1 (702) 461-6194
>
> www.swiftaviationgroup.com
>
>
>
>
> -----Original Message-----
> From: Adam Ferguson [mailto:adferguson1@me.com]
> Sent: Wednesday, January 18, 2012 12:17 PM
> To: Boris Van Lier
> Cc: jgconry@gmail.com
> Subject: Re: Attempted call
>
> Boris,
>
> It is just past midnight here in BKK.
> I have a conference call tmrw and will be providing news on our
> aircraft choice.
> Please e-mail your position so that I can follow up before I head to



EXHIBIT
A

800

DEF   6833

> my meeting at 0900.
>
> Regards,
> Adam
>
> On Jan 18, 2012, at 11:17 AM, Boris Van Lier wrote:
>
>> Adam,
>>
>> I am meeting the FAA tomorrow morning at 1030am to confirm that they
>> can support us. Providing they can and are willing to commit to our
>> certification schedule, we can agree on terms by end of business
>> tomorrow, and draw documents by the end of the week.
>>
>> Our position regarding down payments remains unchanged.
>>
>> We will have to invest in excess of 2MM and commit to aircraft for at
>> least 36 months for an 18 month program.
>>
>> I am comfortable that I can deliver on the certification schedule and
>> the performance. The only two hurdles remaining are the FAA support
>> and the term sheet.
>>
>> As soon as I am back from the FAA I will contact you.
>>
>> Regards,
>>
>> Boris
>>
>> PS, sorry about last night. I set my alarm for 12:30am, call you a
>> couple of times but could not get hold of you. I went back to sleep
>> and never heard the phone ring. I guess I was tired.
>>
>>
>>
>>
>>
>> -----Original Message-----
>> From: Adam Ferguson [mailto:adferguson1@me.com]
>> Sent: Tuesday, January 17, 2012 7:00 PM
>> To: Boris Van Lier
>> Subject: Re: Attempted call
>>
>> Boris,
>>
>> I left a few vm yesterday and last night.  The 752 option is very
>> attractive to us, but I have doubts that Swift can perform given
>> everything else they have on their plate.
>>
>> Regards,
>> Adam
>>
>> On Jan 17, 2012, at 5:24 PM, Boris Van Lier wrote:
>>
>>> Adam, please call me. I just tried to call you and received a
>>> message
>> your number is unattended
>>>
>>> Sent from my iPhone
>

DEF  6834



# SWIFT AIR, LLC

Swift Air, LLC
2406 South 24th Street
Suite E-102
Phoenix, Arizona 85034

# AIRCRAFT ACMI CHARTER AGREEMENT

This Aircraft ACMI Charter Agreement is made and entered into as of April 6, 2012 by and between Swift Air LLC, a limited liability company ("Carrier"), having its principal place of business at 2406 South 24th Street, Suite E-102, Phoenix, AZ 85034, and Saipan Air Inc., a Commonwealth of Northern Marianas Islands limited liability corporation ("Charterer"), having its principal place of business at TSL Plaza, 3rd Floor, Saipan, MP 96950.

WHEREAS, Carrier desires to charter to Charterer, and Charterer desires to charter from Carrier, two (2) Boeing 757-200s ("B757-200") and one Boeing 737-400 ("B737-400") (referred to herein as "Aircraft 1, Aircraft 2 and Aircraft 3" or collectively as "Aircrafts") operated by Carrier from Charter's base of operations in Saipan, MP ("SPN") as set forth and described more fully herein;

WHEREAS, Charterer hereby engages Carrier to provide, and Carrier hereby agrees to provide to Charterer during the term of the Agreement specified below, at Carrier's cost and expense, the Aircraft, Crews, Aircraft Maintenance Support and Airline Liability Insurance relating thereto, in connection with Carrier's operation of Charterer's Flight Program, all in accordance with, and subject to, the terms and provisions of this Agreement and any and all applicable law.

NOW, THEREFORE, for and in consideration of the promises and covenants herein contained and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

## 1.    Term of Charter

1.1.    Subject to such delayed commencement, early termination or extension as may be permitted under this Agreement; the charter contemplated herein will commence on July 1, 2012 ("Commencement Date") and will terminate on March 1, 2014.

## 2.    Condition Precedent

2.1    Performance of this agreement by all parties is conditional upon the occurrence of the following events described in this section.

2.2    Charterer's satisfactory due diligence of Carrier's financial condition, which shall be acceptable to Charterer at Charterer's sole discretion. Carrier agrees to provide Charterer sufficient information to allow Charterer to assess the financial and commercial condition of Carrier.

2.3    No material adverse change in Carrier's financial condition from the date hereof to the date the Aircraft is delivered to Carrier.

EXHIBIT
B

Init SA_____    Init Charterer_____

2.4   Charterer receiving favorable opinion from independent counsel that all filings and recordings necessary to protect Charterer's interest in the Aircrafts in the Country of Registration shall be accomplished by the filing of the documentation required for the Lease.

2.5   No loss or destruction of the Aircrafts prior to the Delivery Date.

2.6   Carrier providing the following documents, each in form and substance satisfactory to Charterer and/ or industry standard.  Charterer may at its sole discretion request additional documents to satisfy itself within reason and mutually agreed:

   a)  Certificate(s) evidencing satisfactory insurance coverage of the Aircraft, together with broker's undertaking letter(s).

   b)  An officer's certificate, certified resolutions and an incumbency certificate.

   c)  Evidence that the Charterer's interest shall be appropriately recorded or perfected.

   d)  Evidence that Carrier has received all necessary and appropriate governmental approvals.

2.7   Execution and delivery of all other documentation associated with this transaction, including but not limited to the Lease, in form and substance satisfactory to Charterer, at Charterer's sole discretion, with all proprietary detail removed at the discretion of the Carrier;

2.8   Carrier's inspection of the Aircrafts and Aircraft Records.

2.9   Carrier will ensure IFE systems are in working condition.

2.10   Carrier obtaining foreign approvals. The Charterer agrees to provide assistance with the approval process and will be responsible for any associated cost with the foreign approvals. The Charterer assistance includes but not limited to seeking assistance from government officials, legal representation or a combination thereof. Carrier is not responsible for any foreign approval failures or delay due to no fault of the Carrier.  Delay of foreign approvals will not be cause for any of the terms and conditions of the contract to be waived by either party, unless at fault of the carrier.

2.11   Carrier shall pay lease payment in timely manner and will maintain their account with the aircraft lessor(s) in good standing. Charterer shall have the right to inquire with the aircraft lessor(s) to verify the account status, with Carriers approval, which shall not be unreasonably withheld.

2.12   Carrier will notify Charterer within 30 days of any ownership or substantial management changes. Should the current COO of the Carrier,  Boris van Lier separate from the Carrier at any time, Charterer reserves the right to terminate this Agreement at any time at no cost or other liability to Charterer.

2.13   Carrier will provide plans to change status with US DOT from Supplemental

carrier to Flag carrier by September 30, 2012. Carrier will ensure status is complete no later than December 31, 2012 to enable Charterer to file for scheduled service in China and Japan.

2.14 Carrier will ensure plans to commence qualifications necessary for ETOPS certification from FAA by September 30, 2012.

## 3.    Obligations of the Charterer

3.1 Charterer will timely remit to Carrier the amounts set forth in Appendix A.

3.2 Charterer will provide, at its expense, catering for the passengers and crew.

3.3 Charterer will provide, at its expense, any and all dry goods including but not limited to head rest covers, airsickness bags, blankets and pillows, cups, napkins, garbage bags and coffee stirrers.

3.4 Charterer will provide, at its expense, In Flight Entertainment ("IFE").

3.5 The base of operation of the Aircraft and Crew will be SPN. Charterer shall have the right to change the base of operation under this Agreement by giving at least 30 days' advance written notice thereof to Carrier; provided, however, Charterer shall be responsible for all out-of-pocket expenses incurred by Carrier in connection with such change, including but limited to all employee relocation, hiring and training costs and expenses, all such expenses to be paid by Charterer within five (5) Business Days after receipt of an invoice from Carrier setting forth any or all such costs and expenses, which invoice shall be accompanied by reasonable substantiation of Carrier's payment and the amount and purpose thereof.

3.6 Charterer will provide adequate airport office space for a minimum of 8 line mechanics, tooling space as well as Class A office space for a minimum of 3 Management/Supervisor staff to oversee the contract.

3.7 Charterer will pay all fees applicable to aircraft parking and aircraft security.

3.8 Charterer will provide, at its expense, passenger baggage handling including baggage tags and all required security and inspections. Charterer will issue and deliver to each charter passenger Carrier' standard baggage tag for each item of baggage accepted by Carrier at check-in for transportation on the charter flight.

3.9 Charterer will provide, at its expense, passenger ticketing, check-in and all necessary Ground Security Coordinators at all locations serviced with scheduled flights or charter flights.

3.10 Charterer will process any baggage or cargo claims. However, Carrier will be liable for any damage to or loss of baggage or cargo while under its control pursuant to its contract of carriage and applicable terms of the Montreal Convention.

3.11    Charterer will arrange for collection and remittance of any baggage or cargo claims.

3.12    Charterer will arrange for collection and remittance of any and all taxes, fees, passenger facility charges (PFC's), security charges and related charges which are assessed on a "per passenger" basis or based on air transportation revenue, excluding taxes based on the net income of Carrier, which are imposed by any governmental authority or airport authority, including but not limited to departure taxes, arrival taxes, head taxes, excise (air transportation) taxes and ticket taxes. Charterer will notify Carrier of the 9/11 fees, Segment fees and US Federal Excise Taxes ("FET's") collected for each flight, on a monthly basis. Accounting and payment of said fees shall be remitted to Carrier at the time payment is made for the related flight in accordance with Appendix A, Charterer shall make such payment into the Carrier's account shown in Appendix B. In the event Carrier's reconciliation set forth in Section 4.2 reflects additional fees are owed or to be refunded, Charterer shall make such payment or receive such refund as provided for in Section 4.2. Payments due to either party shall be made into each party's respective account shown in Appendix B.

3.13    Charterer will be responsible for all necessary DOT filings required under 14 CFR Part 380. Carrier shall cooperate in signing such applications and forms.

3.14    Charterer will arrange and pay for all cockpit crew (to include captains, first officers and reserve pilots) accommodations in SPN.

3.15    Charterer will arrange and pay for all required crew member and technician transportation to and from living accommodations and the airport. This does not apply to cabin crew hired directly by Charterer.

3.16    Charterer will provide meal discounts for crew members (crew members to include; Captains, First Officers, Flight Attendants, Technicians and Management staff) at Charterer's facilities.

3.17    Charterer will arrange and pay for four star hotel accommodations for all crews and technicians, if required, at night stops outside of the operational base for all reasons other than mechanical delays.

3.18    Carrier shall be responsible for all maintenance of the aircraft in accordance with carrier's approved maintenance program. Charterer will allow Carrier to utilize CTSI to ship parts from Los Angeles to Saipan at discounted cost basis. Charterer will provide a warehouse for the purpose of storing all aircraft parts. Charterer will provide a suitable air conditioned secured space for storage of aircraft parts that must be stored in a climate controlled area. Should Carrier not be able to secure required maintenance personnel in Saipan, Charterer will provide accommodations for maintenance personnel in Saipan.

3.19    Charterer will arrange and pay for all economy class travel and accommodations for Carrier trainers.

3.20    Charterer shall provide office space for crew check-in and maintenance personnel. Facilities must have a desk, internet connection, and telephone capabilities.

3.21   Charterer will arrange for and pay any and all customs, immigrations, agricultural and other inspection fees or charges and related expenses including per passenger fees and taxes if any.

3.22   Charterer will pay any and all fines including customs or immigration fines related to illegal contraband carried onboard by passengers of any Carrier aircraft, with exception of crew or Carrier related personnel.

3.23   Charterer will pay for landing fees, traffic rights and fees, en route navigation and over flight charges, air traffic control fees and other similar charges.

3.24   Charterer will arrange for and pay ground and aircraft handling, including aircraft marshaling, air start, ground power units, pushback of aircraft, stairs, deicing and cleaning of aircraft interior and exterior. Equipment provided in this regard will include ground power units at all layover stations, maintenance stands and nitrogen/oxygen service.

3.25   Charterer will arrange and pay for all necessary work permits and airport security clearance badges for employees or contractors of Carrier, applicable to this Agreement.

3.26   Charterer will arrange for fuel, and into-plane service of fuel, oil, taxes and applicable fees for all flights conducted hereunder and pays any costs for these items with respect to the flights operated.

3.27   Charterer will submit a manifest with passenger documentation for the purpose of submitting APIS and checking against the No-Fly List at least seventy-two (72) hours prior to flight. Charterer will submit a second manifest with the most updated passenger information at least twenty-four (24) hours prior to flight. Charterer will pay for all fees related to submitting APIS and checking against the No-Fly List. Charterer will pay for all fines or penalties as a result of the illegal transportation of passengers and/or Charterer's employees and their property on the Aircraft.

3.28   Charterer will document providing each passenger access to the Carrier Contract of Carriage.

3.29   Charterer will pay for any and all fines resulting from airport curfew violations unless such violations were caused by Carrier.

3.30   If the operational area extends beyond the currently planned flights between Saipan and Japan/China, Charterer will advise Carrier 60 days in advance to allow for additional crew and to ensure insurance is secured for the said destination.

## 4.   Obligations of Carrier

4.1   Carrier agrees to charter certain aircraft. (the "Aircraft") to Charterer in accordance with the terms and conditions of this Agreement. The aircraft type and capacity, routing(s), price, payment schedule, and related information are set forth in Appendix A.

4.2     Carrier will collect from the Charterer in trust any and all taxes, fees, passenger facility charges (PFCs), excise tax, segment fees, security charges and related charges, which are assessed on a "per passenger" basis or based on air transportation revenue and pay to the appropriate governmental agency. Charterer will remit all US Federal Excise Taxes ("FET's"), Segment fees and all US 911 Fees in the manner provided for in Section 3.12 above. All other fees and taxes owing herein shall be remitted to Carrier within (10) days of receipt of invoice. Monthly, Carrier shall perform a reconciliation of such fees, not to include a block hour reconciliation, for all flight activity for the immediately preceding month. Carrier shall provide such reconciliations to Charterer as soon as possible following each month end setting forth in detail the amounts, if any, which remain due and owing or to be refunded on account of such taxes and fees. The Parties shall have ten (10) days from date of the reconciliation to make payments to the other as required pursuant to the reconciliation. Payments due to either party shall be made into each party's respective account shown in Appendix B

4.3     In consideration of payment by Charterer of the amounts set forth in Appendix A, Carrier will provide and operate the Aircrafts, and will provide, including any wage, salary or other employment benefit, the following personnel and services in respect of such operation:

   A.   A sufficient number of Flight Crews, based in SPN, will be provided to operate Charterer's Flight Program, agreed in advance by the Charterer.
   B.   Charterer will provide Cabin Crews to be trained and qualified under Carrier's training program. Carrier will provide sufficient cabin crews to complete training of Charterer's cabin crew in July 2012 only at Carrier's expense.
   C.   The cost of the initial certification training to adequately staff the aircrafts is at the cost of the Carrier (except for travel to or from any training facilities), Charterer agrees to pay for all accommodations for training personnel. Additional training (due to attrition etc.), transition, or requalification training of Charterers cabin crew, will be provided by the Carrier at cost.   Charterer agrees to pay for travel and accommodations in these circumstances.
   D.   All normal pay and allowances payable by Carrier, to its above identified employees;
   E.   All necessary drug tests for all Carrier personnel provided that such services are available in Saipan. If such drug testing facilities are not available in Saipan, Charterer shall be responsible for all fees, including accommodations and economy class travel for the minimum drug testing required by government regulations.
   F.   Flight dispatch services, as required by government regulations, by the appropriate carrier for the Aircrafts with respect of the flights conducted hereunder;
   G.   All necessary scheduled and unscheduled maintenance and repairs to the Aircrafts by the appropriate carrier in accordance with governmental requirements and Carrier's approved maintenance programs;
   H.   Insurance as set forth below;

Init SA          Init Charterer

4.4     Carrier will accept for transportation as baggage such personal property as is necessary or appropriate for the wear, use or convenience of the charter passenger for the purposes of the charter flight subject to baggage policies as noted in the Carrier Contract of Carriage. Carrier will provide its Contract of Carriage. Charterer will add Carrier's Contracts of Carriage to its web-site.

4.5     Carrier will ensure that an adequate amount of spare parts are available at the SPN airport to support the operation of the Aircrafts. Inventory must include wheels, brake and other line item rotables.

4.6     Throughout the period of the charter hereunder, Carrier will maintain in effect the following insurance in respect of the Aircrafts:

       A. Aviation liability Insurance in respect of Passenger Legal Liability (while on board the Aircraft) and Aircraft Third-Party Legal Liability, with a combined single limit of not less than seven hundred and fifty million dollars ($750,000,000) for any one accident/occurrence:

4.7     Carrier will obtain such insurance from a financially sound insurance company of recognized responsibility and will furnish Charterer with a certificate of insurance evidencing such coverage prior to commencement of the services to be provided hereunder by Carrier. Carrier will use its best efforts to obtain a waiver of all rights of subrogation that such insurer(s) have or acquire against Charterer arising from the services provided hereunder. All insurance policies will provide that the insurance will not be invalidated by any action or inaction of Charterer and that the insurance will continue in full force and effect for at least ninety (90) days after Charterer receives written notice of cancellation, termination or material alteration. Charterer will be added as an additional insured under such policy. Upon request, Carrier will provide Charterer with written evidence of the required insurance coverage.

4.8     Carrier will be responsible for the physical and technical operation of the Aircrafts and the safe performance of all flights, and will retain full authority and control including exclusive operational control and possession of the Aircrafts at all times. The captains of the Aircrafts and the flight dispatchers will have absolute discretion in all matters concerning the preparation of the Aircrafts for flights and the flights themself, the load carried and its distribution, the decision whether or not a flight will be undertaken, the route to be flown, the place where landings will be made, and all other matters relating to the safety in the operation of the Aircrafts.

4.9     The operation of the Aircrafts will be carried out in accordance with applicable regulations and the standards and practices of as set forth in each carriers approved flight operations manual.

4.10     All services provided by Carrier under this agreement will be subject to all applicable governmental rules and regulations. agrees to comply, and agrees to cause its officers, employees, contractors, agents and representatives to comply with all applicable regulations of the United States, U.S. Department of Transportation, the Federal Aviation Administration and all other agencies or authorities that have jurisdiction.

    Init SA ____     Init Charterer ____

4.11    Carrier will guarantee that all Aircrafts will be in position at the delivery date. Should any Aircraft be delayed, Carrier will provide N250MY, (B767-200ER or equivalent) as substitute aircraft. Carrier will be responsible for the cost of (re)delivery of any substitute aircraft. The rental fee rate for N250MY or equivalent (B767-200ER) is USD$2900 per block hour based on a 190 hour monthly guarantee, unless contracted equipment arrives while said replacement equipment is in service.

4.12    Should two out of three Aircraft become unserviceable, Carrier will notify Charterer within 24 hours of such event. If two Aircraft remain unserviceable for more than 48 hours, Carrier will provide an adequate substitute aircraft solely at Carrier's cost.

4.13    Carrier will expedite an application to obtain an Accounting Code allowing Charterer access to IATA Settlement Systems (BSP and CASS). All cost associated with this application, including Bonds and Deposits, shall be the responsibility of the Charterer.

4.14    All Payments to Charterer shall be made free and clear of all taxes and duties, including withholding tax, sales, use, and excise taxes, VAT and income taxes. All taxes, other than taxes on the income of Charterer shall be the responsibility of Carrier.

4.15    Carrier shall at all times maintain an on-time departure performance record of 90% per calendar month. A flight is counted as "on time" if it operated less than 15 minutes later than the scheduled time. The on-time departure performance record is based on Carrier controlled delays only and will not include those delays that are outside operational control of the carrier.

          In the event that Carrier falls below 90% on-time departure performance record, Carrier shall be considered in default. Carrier shall have thirty (30) days from written notice of default by Charterer to cure and improve its on-time gate departure rate to comply with this Section.

4.16    Carrier shall at all times maintain a flight completion of 100% per calendar month. Carrier understands that Charterer is leasing 3 Aircrafts specifically for purpose of ensuring 100% completion of each and every scheduled flight as specified in Appendix A. In the event that Carrier falls below such flight completion rate, Carrier shall be considered in default. Carrier shall have thirty (30) days from written notice of default by Charterer to cure and improve its on-time gate departure rate to comply with this Section.

          The flight completion performance record is based on Carrier controlled cancellations only and will not include those cancellations that are outside operational control of the carrier (i.e. weather conditions at departure, enroute, destination or required alternate airports)

4.17    Carrier shall provide Charterer a monthly summary of total fuel consumption per flight for each Aircraft. Carrier shall use best efforts to maintain consistent most economical use of fuel per flight.

## 5.   Limitations upon Liability

5.1   Carrier's obligations under this Agreement will extend only to the loading, flight operations and unloading of the Aircrafts and the safety of the passengers during embarking, flight and disembarking from the Aircrafts. Except as otherwise required by the terms of the Montreal Convention or other applicable U.S. or foreign law, Carrier will have no responsibility for operations of any airport or other facility or damage to property or injury of passengers outside the Aircrafts or caused by any personnel or equipment outside the Aircrafts not employed or owned by Carrier. Charterer waives any and all claims, assertions of right and causes of action arising out of any circumstances beyond those for which Carrier is responsible for under the terms of this paragraph.

5.2   Carrier will have the right to cancel any one or more charter flights immediately, in the event of the occurrence of any of the following:

A.   Charterer fails to make any payment as prescribed in this Agreement.
B.   Charterer or any of its agents, officers or employees fails to comply with any of the terms and conditions of this Agreement.
C.   Charterer makes any material misrepresentations in any of the information supplied by the Charterer to Carrier. Such grace period notification will commence upon the determination by Carrier of when the event occurred.

Carrier agrees to give Charterer written notice with a five (5) day grace period for cure in the event of occurrence of any of the aforesaid.

5.3   The times of boarding and departure from the origin point and all intermediate points on the charter flight will be determined by Charterer but are subject to aircraft routing, gate space, weather conditions and other operational factors beyond the control of the operator. In the event that operational constraints and/or airport restrictions prohibit a departure time prior to midnight on the local date shown in this Agreement, Carrier will affect a departure at the closest possible time thereafter. Carrier assume no obligation to commence or complete transportation within a certain time or according to any specific schedule set forth in this Agreement, and Carrier will not be held liable for failure to do so or for error in any assignment of times of arrival or departure except where such delay was caused by the Carrier.

5.4   Charterer understands that Carrier at its option may permit the use of any unused space on any of the charter flights for the transportation of company material or for the transportation of personnel of Carrier or other airline personnel. Subject to weight restrictions and prior agreement from Charterer.

## 6.   Termination for Default

6.1   In the event any party fails to comply with any of its duties, obligations, covenants, representations or warranties hereunder, or in the event of (a) the dissolution, liquidation, suspension of business or immediate termination of existence of such party; (b) the insolvency or bankruptcy of such party; (c) the

making by such party of an assignment for the benefit of creditors; (d) the consent of such party to the appointment of a trustee or receiver for such party for all or a substantial part of its business; (e) the admission by such party of its inability to pay its debts as they mature; or (f) the institution by or against such party of bankruptcy, reorganization, arrangement, insolvency, or liquidation proceedings or any other proceedings for relief under any bankruptcy or similar law for the relief of debtors, then the other party will have the right to terminate this Agreement immediately. Such right of termination, whether or not exercised, will not be an exclusive remedy, but will be in addition to all other legal and equitable rights and remedies available to such other party.

## 7. Force Majeure

7.1    "*Force Majeure* Event" means any act or event, whether foreseen or unforeseen, that meets all three of the following tests:

   (i)    The act or event prevents a party (the "Nonperforming Party"), in whole or in part, from:
     (A)   performing its obligations under this Agreement; or
     (B)   satisfying any conditions to the Performing Party's obligations under this Agreement.
  (ii)    The act or event is beyond the reasonable control of and not the fault of the Nonperforming Party.
 (iii)   The Nonperforming Party has been unable to avoid or overcome the act or event by the exercise of due diligence.

7.2    Acts and Events Included in the Definition of *Force Majeure* Event.

*Included Acts and Events.* In furtherance of the definition of *Force Majeure* Event and not in limitation of that definition, each of the following acts and events is deemed to meet the requirements of Paragraph 7.1 and to be a *Force Majeure* Event: war, flood, lightning, drought, earthquake, fire, volcanic eruption, landslide, hurricane, cyclone, typhoon, tornado, explosion, civil disturbance, act of God or the public enemy, terrorist act, military action, epidemic, famine or plague, action of a court or government authority, or strike, work-to-rule action, go-slow or similar labor difficulty, each on an industry-wide, region-wide or nationwide basis.

7.3    In the event of a typhoon that causes airport services to be suspended, Charterer's obligations under this Agreement shall be suspended for a maximum of seven (7) days.

7.4    If prior to the Commencement Date, Charterer or Carrier is unable to comply with its respective obligations by reason of *Force Majeure*, Charterer shall not be deemed to be in default for the delay. In such case, for each 24 hours the minimum agreed block hours will be lowered with the corresponding daily coefficient of block hours. If the *Force Majeure* event continues for longer than twenty (20) days, this Agreement will be deemed cancelled at the request of Charterer or Carrier.

   Init SA _____    Init Charterer _____

**8.   Indemnification**

The Parties will indemnify and hold one another (including without limitation, their officers, directors, employees, servants and agents), for, from and against all damages and claims for damages, demands, liabilities, actions, losses, costs, taxes, assessments, suits, recoveries, judgments or executions (including, without limitations, reasonable cause of investigation, litigation costs, court costs, expert witness fees, litigation support services, settlement cost or reasonable attorney's fees), damages or injury to person or property (including, without limitation, injury resulting in death) however caused arising from or relating to any act of the other Party or its agents, employees or other persons for whom the Party is responsible (whether by the Party's acts or omission or the act of any passenger with whom the Party has contracted) or any breach of this Agreement or as it may relate to any other subject matter of this Agreement.

**9.   Default**

9.1   In the event of a default in payment of any sums due under this Agreement, except when the default is due to default of Carrier for circumstances within its control including acts or omissions by its personnel, whether negligent or intentional, the defaulting party will pay to the non-defaulting party interest upon such sums, from the payment due date until paid in full, at the rate of five percent (5%) per annum above the prime rate of interest specified in the Western Edition of The Wall Street Journal or any successor publication, adjusted for any change in such prime rate of interest.

9.2   In the event of default hereunder and suit resulting there from to enforce any provision of this Agreement, any party against whom judgment is awarded will be liable to the non-defaulting party for all of its costs and expenses, including reasonable attorneys' fees incurred in the preparation, prosecution and appeal of such suit for enforcement or damages. The Parties shall have the right of injunctive and other equitable relief.

9.3   In no event will the Charterer or any party for whom the Charterer is responsible be entitled to recover from Carrier any amount in excess of the aggregate of proceeds from insurance provided in accordance with this Agreement, deductible amounts payable by Carrier with respect to such insurance, and the fees paid to Carrier under this Agreement. Charterer, for itself and to the extent permitted by law for those parties for which Charterer is responsible under the terms of this Agreement, waives and releases any claim, assertion of right or cause of action that the Charterer and such parties may have to recover against Carrier for any amount in excess of the limitations set forth in this paragraph.

**10.   Clause Headings**

10.1.   All headings herein are inserted for convenience only and will not affect the validity, construction or interpretation of this Agreement.

## 11.    Entire Agreement

11.1.    This Agreement, together with Appendix A, B, and C constitute the entire agreement between the parties and supersedes any prior agreement or understanding, written or unwritten, regarding the subject matter hereof. Any amendment or variation to this Agreement will be in writing and will be valid only when signed by the duly authorized representatives of both parties and approved by cognizant governmental authorities to the extent required.

## 12.    Applicable Law

12.1.    This Agreement will be governed by and construed in accordance with the laws of the State of New York. Charterer hereby agrees that either party may enforce this Agreement in any court of competent jurisdiction, and hereby irrevocably submits to the jurisdiction of any such court, including the courts located within the State of New York for such purpose.

## 13.    Setoff and Abatement

13.1.    All payments provided for herein will be paid in full and without setoff, defense, counterclaim or deduction of any kind arising from any other transaction or relationship, direct or indirect, which may exist between the parties.

## 14.    Confidentiality, Non competition and Non-solicitation

14.1.    Except as otherwise required by law and as necessary to conduct business operations, neither party will permit any of its directors, officers, employees, or agents to disclose to any person or entity, other than those permitted in writing by the other party prior to disclosure, any information contained in this Agreement. Notwithstanding the foregoing, either party may disclose information in this Agreement required by law, rule or regulation to be furnished to the Federal Aviation Administration, the Department of Transportation, or any other governmental agency having jurisdiction over the charter flight arrangements or operations contemplated by this Agreement.

## 15.    Notices

15.1.    All notices hereunder will be given by e-mail with receipt confirmed via telephone, express delivery with confirmed receipt, or by certified or registered mail with postage prepaid, and addressed as follows:

Init SA ____    Init Charterer ____

|  | If to Charterer, to: | If to Carrier, to: |
|---|---|---|
| Company | Saipan Air | Swift Air LLC |
| Address | TSL Plaza 3rd Fl.<br><br>Garapan, Saipan MP 96950 | 2710 East Old Tower Road<br><br>Phoenix, AZ 85034 |
| Country | USA | USA |
| Contact | Adam Ferguson | Boris van Lier |
| Phone | 670-233-8080 | +1 (866) 277-9438 |
| Fax |  |  |
| Email | adam.ferguson@saipanair.com | Bvanlier@swiftaviationgroup.com |

Or to such other address as either party may designate in accordance with this Section 15.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by and through their duly authorized officers as of the date first written above.

| Saipan Air Incorporated | Swift Air LLC |
|---|---|
| Signature: | Signature: |
| Name:<br>Adam D. Ferguson | Name:<br>Boris van Lier |
| Title:<br>Vice President/COO | Title:<br>President/ COO |
| Date:<br>April 6, 2012 | Date:<br>April 6, 2012 |

## APPENDIX A

### 1. Charter Itinerary

EQUIPMENT:

Aircraft 1 - Boeing 757-200 MSN 28174 ("Aircraft 1")
Aircraft 2 - Boeing 757-200 MSN 30043 ("Aircraft 2")
Aircraft 3 - Boeing 737-400 MSN 24804 ("Aircraft 3")

CONFIGURATION:

Aircraft 1 – 16 Business Class/ 178 Economy Class seats
Aircraft 2 – 16 Business Class/ 178 Economy Class seats
Aircraft 3 – 12 Business Class/ 138 Economy Class seats

**As scheduled by Charterer and agreed upon by Carrier.**

Schedules will be provided to Carrier by Charterer no later than thirty (30) days prior to each flight date. For example, the July 1st 2012 schedule will be provided by June 1, 2012.

### 2. Charges

|  | July 1 2012 – July 31 2012[1] |
| --- | --- |
| Aircraft 1 | US$3,600 per Block Hour |
| Aircraft 2 | N/A |
| Aircraft 3 | US$2,750 per Block Hour |

|  | August 1 2012- March 1 2014[2] |
| --- | --- |
| Aircraft 1 | US$3,150 per Block Hour |
| Aircraft 2 | US$3,150 per Block Hour |
| Aircraft 3 | US$2,650 per Block Hour |

All block hour payments are due fifteen (15) business days prior to each week's scheduled flights. Charterer will not be charged for other than block hour time, i.e., from the time the chocks are removed from the wheels are removed from the Aircraft until the time the cocks are again returned to the Aircraft.

---

[1] Includes Cabin Crew
[2] Excludes Cabin Crew

Init SA _____     Init Charterer _____

## 3. Minimum Block Hours

| | July 1 2012 – July 31 2012 |
|---|---|
| Aircraft 1 | 190 |
| Aircraft 2 | N/A |
| Aircraft 3 | 210 |

| | August 1 2012- March 1 2012 |
|---|---|
| Aircraft 1 | 540 total for aircraft both |
| Aircraft 2 | |
| Aircraft 3 | 210 |

In the event that the Block Hours flown are less than the Minimum Utilization Guarantee, Charterer shall pay to Carrier the Minimum Utilization Guarantee.

## 4. Additional Usage

The Rental Fees for any additional utilization of the Aircraft during the Term by Charterer beyond the guaranteed minimum Block Hours shall be:

Aircraft 1 – US$1,950 per Block Hour for hours in excess of MMG[3]

Aircraft 2 – US$1,950 per Block Hour for hours in excess of MMG

Aircraft 3 – US$1,950 per Block Hour for hours in excess of MMG

## 5. Payment

Scheduled flight payments shall be made into the escrow account shown in Appendix B.

The following prepayments are required and shall be disbursed by wire transfer, transmitted to and deposited in Carrier's Account:

☐   15th calendar day of the month - 50% of the next months' Minimum Monthly Guarantee at the Rental Fee rate per Block Hour

☐   Last month day of the month - 50% of the next months' Minimum Monthly Guarantee at the Rental Fee rate per Block Hour

Any and all other fees and charges invoiced to carrier outside of ACMI services will be paid directly by Charterer with proof of payment to Carrier with 15 days of receipt of invoice.

## 6. Positioning and Depositioning

The Parties agree that, upon acceptance of the Aircrafts by Charterer, Carrier will arrange a ferry flight (the "Initial Ferry/Positioning Flight") to position the Aircrafts at Saipan

---

[3] Not applicable in from July 1 thru July 31, 2012

Init SA ___     Init Charterer ___

International Airport ("SPN"), where specified by Charterer.  Charterer shall make all necessary arrangements for the parking of the Aircrafts at SPN at Charterer's sole expense and effort.  In addition, Charterer shall pay to Carrier on or before a flat fee of:

Aircraft 1 – US$110,000 each way

Aircraft 2 – US$110,000 each way

Aircraft 3 – US$80,000 each way

This fee is to compensate Carrier for the Positioning and De-positioning Flights, in lieu of all costs associated with such ferry flight, including, but not limited to, landing charges and fuel. This fee must be paid 3 (three) days prior to departure.

## 7.  Delivery of Aircrafts

Carrier shall deliver the Aircrafts in fully airworthy condition to Charterer on the Delivery Date at Saipan International Airport (SPN). Inspection of the Aircrafts for acceptance of its interior by Charterer shall be carried out by the Parties under Charterer's responsibility. Upon acceptance, Charterer shall execute and provide to Carrier in connection with the Delivery of the Aircrafts the Delivery and Acceptance. Charterer's execution and return of the acceptance certificate to Carrier shall constitute irrevocable evidence that the Aircrafts are in compliance with all conditions necessary to acceptance and that Charterer unconditionally accepts the Aircrafts for Charter under this Agreement.  Carrier shall deliver to Charterer: Aircraft 1 on June 28, 2012; Aircraft 2 on July 29, 2012; and Aircraft 3 on June 28, 2012.

Unless the Agreement is renewed or terminated earlier in accordance with its terms, Charterer shall deliver the Aircrafts to Carrier at the end of the Initial Term at (the "Re-Delivery").  If the Agreement is renewed for one or more additional Renewal Terms, Re-Delivery shall take place at on the day after the last day of such Renewal Term.  If the Agreement is terminated prior to the end of the Initial Term or any Renewal Term, Re-Delivery shall take place the next day at local time, at SPN.

## 8.  Security Deposit

Charterer shall place a non-refundable Security Deposit of:

☐    US$900,000 cash three days following the term sheet execution

Charterer shall obtain a Non Revocable letter of credit with a U.S. bank of US$900,000 before May 1, 2012.

The security deposit shall be non-refundable except in the event that any of the condition precedent events described in Section 2 herein do not occur. In any of the above cases, the security deposit shall be returned to Charterer via wire transfer within five (5) business days.

Subject to satisfaction in full of all of Charterer's obligations under the Charter Agreement,

no later than ninety (90) days after the termination date of the Charter Term an amount equal to the remaining balance of the Security Deposit shall be returned to the Charterer without interest.

## 9.  Miscellaneous

During the term of the Agreement the aircraft shall be based in SPN. Carrier will manage the flight program on behalf of Charterer for all Carrier flights operating to and from Saipan.

Charterer shall have the option to apply decals to the exterior of the aircraft at its own cost. Such decals shall be removed at Charterer´s cost upon redelivery.

The Boeing 737-400 aircraft will require dual Long Range Navigation Units capable of Class II Navigation and dual HF, as agreed by Carrier to comply with all FAA requirements for over-water safety programs.

Charterer and Carrier will mutually work together to identify replacement lift for Aircraft No 3 on terms and conditions mutually agreed.

Carrier and Charterer shall be individually responsible for its own costs and expenses (including attorney's fees and disbursements) associated with negotiation and documentation of this transaction, except as otherwise provided herein.  The parties shall share equally the fees and disbursements of special FAA counsel (including the cost of any necessary and appropriate registrations on the International Registry pursuant to the Cape Town Convention).

Init SA          Init Charterer

**APPENDIX B**

**1. Wire Transfer Information for Payments to Swift Air LLC**

[NAME OF BANK]

ABA NUMBER:              222370440

ACCOUNT NUMBER:      1001217387

BENEFICIARY:              Shelby Financial/Swift Air Escrow

*Please include with wire transfers exact flight information*

(Example: July 1, 2012 SPN NRT SPN)

BANK CONTACT:          Doug Fleagle

PHONE:                        609-617-2807

FAX:                            610-993-8006

**2. Wire Transfer Information for Payments to Saipan Air**

[NAME OF BANK]

ABA NUMBER:

ACCOUNT NUMBER:

BENEFICIARY:

BANK CONTACT:

PHONE:

FAX:

March 24, 2012



# SWIFT AIR

## Two Used B757-200s

This term sheet outlines the basic terms and conditions upon which International Lease Finance Corporation ("**ILFC**") proposes on behalf of owner to lease to Swift Air, located at 2406 South 24th Street, Phoenix, Arizona 85034 ("**Swift Air**") the Aircraft described below.

Following your acceptance of the terms and conditions set forth in this term sheet, ILFC will propose a draft of the definitive lease agreement which will contain the terms set forth herein and other terms customarily used by ILFC for Aircraft of this type.

| | |
|---|---|
| **Aircraft:** | Two used B757-200 Aircraft MSN 28174 and 30043 with RB211-535E4 engines previously on lease with North American Airlines. |
| **Date of Manufacture:** | MSN 28174: 1999.<br>MSN 30043: 2000. |
| **Specification:** | See attached. |
| **Owner / Lessor:** | ILFC or an entity wholly owned directly or indirectly by ILFC. |
| **Manager:** | ILFC or an entity wholly owned directly or indirectly by ILFC. |
| **Delivery Date:** | MSN 28174: ILFC will use commercially reasonable efforts to deliver no later than May 15, 2012.<br>MSN 30043: ILFC will use commercially reasonable efforts to deliver no later than June 15, 2012. |
| **Delivery Conditions:** | ILFC will deliver the aircraft with 16 first class and 178 economy class seats, and painted in Swift Air's livery. Otherwise the aircraft will be accepted 'as is.' |
| **Delivery Location:** | Goodyear, Arizona (or other location mutually agreed to by and between Swift Air and ILFC). |
| **Lease Term:** | MSN 28174: 54 months.<br>MSN 30043: 54 months. |
| **Monthly Rent (per Aircraft):** | US$175,000 payable in advance. |



EXHIBIT
C

March 24, 2012

MSN 28174:  From the Delivery Date until July 1, 2012, Swift Air will pay a power by the hour rent equal to $740 per hour, after which the full monthly rental begins.  Beginning on the Delivery Date, reserves will be paid according to the schedule below.

MSN 30043:  From the Delivery Date until August 1, 2012, Swift Air will pay a power by the hour rent equal to $740 per hour, after which the full monthly rental begins.  Beginning on the Delivery Date, reserves will be paid according to the schedule below.

**Security Deposit (per Aircraft):**

US$350,000 in cash, payable as follows:

| Date | Amount |
| --- | --- |
| Three (3) business days following the term sheet execution | US$88,000 |
| Three (3) business days following the lease execution | US$88,000 |
| Three (3) business days prior to delivery | US$174,000 |

**Airframe Reserves:**

US$18,500 per month for S4C check.
US$35,000 per month for C checks (excluding S4C).

**Landing Gear Reserves:**

US$3,500 per month.

**APU Reserves:**

US$40 per APU hour.

**Engine Performance Reserves: (per flight hour per engine)**

During the first calendar year of the lease term, Swift Air shall pay Engine Performance Restoration Reserves based upon a 4:1 hour to cycle ratio. On the first day of January following such calendar year, the Engine Performance Restoration Reserves shall be adjusted based upon the below Hour:Cycle table and Swift Air's actual utilization of each Engine during such calendar year. The adjusted Engine Performance Restoration Reserves rate for each Engine shall apply to the calendar year in which such first day of January falls. A similar adjustment shall be made on January 1 of each year thereafter based upon the hour to cycle ratio of the previous year.

| Hour/Cycle Ratio (number of flight hours per cycle) | Reserve Rate (per flight hour per Engine) |
| --- | --- |
| Greater than or equal to 1 hour but less than 2 hours | US$619 |
| Greater than or equal to 2 hours but less than 3 hours | US$411 |
| Greater than or equal to 3 hours but less than 4 hours | US$260 |

March 24, 2012

| Greater than or equal to 4 hours but less than 5 hours | US$220 |
| Greater than or equal to 5 hours | US$200 |

**Engine LLP Reserves:**    US$170 per flight cycle per engine.

**Reserves Escalation:**    Reserve rates are based upon 2012 cost estimates and shall escalate by 3.0% (rounded to the nearest whole number) on January 1, 2013 and on January 1 of each year thereafter except Engine LLP reserves. Engine LLP reserves will be adjusted on January 1st of 2013 and on January 1 of each year thereafter and will be equal to the then-current "Engine LLP Cost Per Cycle." The "Engine LLP Cost Per Cycle" for any given year will be calculated by (1) dividing the manufacturer's list price for that particular year for each Engine LLP by the manufacturer's approved cycle life for each such Engine LLP to arrive at the "Individual LLP Cost Per Cycle" and then (2) adding the Individual LLP Cost Per Cycle for each Engine LLP to arrive at the aggregate Engine LLP Cost Per Cycle.

**Owner Contribution to Reserves:**

*Airframe:*

Upon completion of the first S4C structural check during the lease term in accordance with the then current MPD Owner will add to the Airframe reserves an amount equal to the lesser of (i) the product of the number of full calendar months (measured as of the Delivery date) consumed on the Airframe since the last S4C structural check (or new, if no such check has been completed) multiplied by the 2012 reserve rate (ii) the difference between the amount of the reimbursable portion of such check and the amount in the Airframe reserves on the date the Aircraft was inducted into such check.

For MSN 28174, upon completion of the first S4C structural check during the lease term in accordance with the then current MPD Owner will add to the Airframe reserves an amount equal to the difference between the amount of the reimbursable portion of such check and the amount in the Airframe reserves on the date the Aircraft was inducted into such check.

*Engine Performance:*

Upon completion of the first qualified performance restoration shop visit ("**Shop Visit**") of each engine during the lease term, Owner will add to the applicable engine performance reserves an amount equal to the lesser of (i) the product of the number of hours (measured as of the delivery date) consumed on the engine since the last shop visit (or new if the engine has not had a Shop Visit) multiplied by the lessee's first year engine performance reserve rate and (ii) the difference between the amount of the reimbursable portion of the Shop Visit and the amount in the applicable engine reserve at the time of such Shop Visit.

March 24, 2012

*Engine LLPs:*

For each qualified Shop Visit, Owner will add to the applicable LLP engine reserves an amount equal to the difference between (i) the reimbursable cost of any LLPs that are replaced (less any waste expense) and (ii) the amount in the LLP reserves at the time of such shop visit.

*APU:*

Upon completion of the first APU medium repair ("**APU Refurbishment**") during the lease term, Owner will add to the APU reserves an amount equal to the lesser of (i) the number of APU hours consumed since the last APU Refurbishment (measured as of the Delivery Date) multiplied by the 2012 reserve rate and (ii) the difference between the amount of the reimbursable portion of the APU Refurbishment and the amount in the APU reserve at the time of such APU Refurbishment.

**Title & Registration:**   The Aircraft will be registered in the USA.

**Agreed Value:**   MSN 28174: US$28.5 million.
MSN 30043: US$29.4 million.

On the date of the annual renewal by Swift Air of its insurance policies that occurs not less than 12 months after the delivery date and on each subsequent annual insurance renewal date thereafter during the lease term, the agreed value with respect to each Aircraft will decline by two percent (2%) of the then-current agreed value.

**Lessor Bank Account:**   JPMORGAN CHASE BANK
270 Park Avenue
New York, NY 10017
ABA 021000021
Swift CHASUS33
Acct. 910-2-749067

**Confidentiality:**   This term sheet and its contents are considered confidential information. Both parties shall make commercially reasonable efforts to ensure that confidentiality is maintained.   No disclosure other than that required by applicable law can be made in relation to this term sheet without the express written consent of the undersigned.

**Conditions:**   Subject to Aircraft availability, ILFC Corporate approval, and final documentation regarding this transaction by April 15, 2012.

**Term Sheet Expiration:**   In addition to offering to lease this Aircraft to Swift Air, ILFC has made lease proposals concerning the Aircraft to other operators. Accordingly, ILFC's offer as set forth in this term sheet will expire upon the earlier of (a) ILFC's agreement to lease the Aircraft to a third party or (b) April 1, 2012.

03/27/12

March 24, 2012

If the foregoing is acceptable to you, please confirm your acceptance of and agreement to the terms and conditions set forth above by executing a counterpart of this term sheet in the space provided below and returning the signed copy to ILFC.

Agreed and Accepted:

**International Lease Finance Corporation**          **Swift Air**
By:                                                  By:

_____                     _____ Boris van Cien / COO

Date: _____                        Date: 03/27/2012 _____

**From:** Frank Truskolaski
**Sent:** Monday, May 28, 2012 12:38 PM
**To:** Adam Ferguson
**Cc:** Boris Van Lier
**Subject:** 757/767 Pilots

Adam,

Good morning, Boris asked me to send you a list of the Pilots in training for the 757. We have the following pilots who are two weeks into training as they have completed the computer portion of systems and basic indoc class. They will be in Phoenix this week to complete the hands on Indoc and systems before heading to the simulator in Miami or Seattle. We expect most of them to complete Simulator training on or around the 19th of the month.

They are as follows:

L. Bennett
B. Dolan
E. Passmore
P. Paucar
C. Olsen
V. Tilley
T. Thakkar
P. Legg

We may use Phil on the 737 as he is a better asset on that aircraft, it is being discussed and a determination made tomorrow.

In addition to the above I have the following pilots trained who will support both the NY and Saipan operation.

F Truskolaski
G Carlton (Saipan Based)
K Coots
G Harrington
T Schoenecker

Completing Aircraft Operating Experience:

E Schaff  (Saipan Based)  Will finish June 11th
K Ward Will finish June 16th

We currently have the following pilots in training and who are almost complete and will support the NY and Saipan Operation.



EXHIBIT
D

C Thomas
S Sebring

Lastly we have help from our sister company MLW.  They have five pilots and supplement our pilot group as needed.

Kindest Regards,

*Frank J Truskolaski*
*Chief Pilot*
*Swift Air*
*2406 S. 24th St., Suite E102*
*Phoenix, AZ 85034*
*602-214-2558*



**SWIFT AIR**, LLC

**HAND DELIVERED**

March 29, 2012

Mr. Larus Durnell
Federal Aviation Management Office
Phoenix Certificate Management Office
2800 N. 44th Street, Suite 450
Phoenix, AZ 85008

RE: Letter of Request per 119.51 (c) to amend OPS SPEC

Dear Mr. Durnell,

Please accept this letter as formal letter of request to amend Swift Air's OPS SPECS as required by 14 CFR 119.51(c).

Swift Air intends to add a Boeing 757-200 aircraft (N752NA – Serial Number 28174 – B757-28A), equipped with RB211-535E4 engines, and configured for 194 passengers to our air carrier certificate.

Pending FAA approval, Swift Air desires operations with this aircraft to commence on July 1, 2012. The B757-200 will be utilized for supplemental operations in support of our client base.

Swift Air will submit a certification plan, required documentation, and appropriate manual changes as required in support of this request.

Although Swift Air does not anticipate a requirement for additions (additional paragraphs) to its current Operations Specifications, the addition of this aircraft type will require updates to at least the following:

- **Operations Specifications:**

  A003, A031, A099, B034, B035, B036, B039, B041, B045, B054, B059, C063, C075, D072, D085, D089, D092, D095, D097, D485, and E096.

- **Swift Air Manuals:**

  General Operations Manual (GOM), Pilot Training Manual (PTM), Flight Attendant Manual (FAM), Flight Attendant Training Manual (FATM), Flight Follower Training Manual (FFTM), System Software and Technology Manual (SSTM), Deicing/Anti-Icing Manual, Weight and Balance Program Manual, All Programs Manual (APM), Company Organizational Procedures Manual (COP), General Maintenance Manual (GMM), Fueling Manual, RVSM Manual, and CASS Manual.

- **Manual Additions (Specific to B757):**



**EXHIBIT**

*E*



Maintenance Inspection Program, FCOM, QRH, MEL/CDL, Performance (Handbook) and various manufacturer support manuals.

If you have any questions, or require additional information regarding this notification, please do not hesitate to contact me at your earliest convenience.

Sincerely,



Boris van Lier
COO
Swift Air, LLC

CC:    Reid Walburg
       Todd Jacobs
       Amy Lopez
       Auddie Campbell
       Fred Murray
       Linnon Latham
       Frank J. Truskolaski
       Linnon Latham
       Chris Horton
       Magda Szymanska
       John Carithers

2406 S. 24th Street, Suite E-102
Phoenix, Arizona 85034
U.S.A.
Phone (602)273-3770
www.swiftaviationgroup.com

**FCOM and QRH Development and Revision Service - Services and Materials Order**

| | |
|---|---|
| BCS Message Reference: | SFW-SFW-12-0011-09C |
| Contract Number: | M-Z471-OP-1262 |
| Issue Date: | April 18, 2012 |
| To: | Swift Air LLC **(Customer)** |
| Attachment: | Boeing Technical Services - Standard Terms and Conditions |

This offer is made to Customer incorporating the terms and conditions of: (i) the Customer Services General Terms Agreement **(CSGTA)** between Customer and The Boeing Company **(Boeing)** as of the date of this offer; and (ii) the Boeing Technical Services – Standard Terms and Conditions provided as an attachment hereto. All capitalized terms used but not defined in this offer have the same meaning as in the CSGTA. On the date Customer accepts this offer in the manner prescribed below, this offer will become an Order under the CSGTA.

In this offer, the term **Aircraft** means the Boeing model 757-200 aircraft, serial number(s) 28174 (NT239) and 30043 (NT242).

## Statement of Work

Boeing will provide Customer a new Flight Crew Operations Manual and Quick Reference Handbook **(QRH)** and Revision Service, based on the procedures for Boeing's current 757 program. The Flight Crew Operations Manual and QRH will be in English and will integrate the graphics, schematics, descriptions and procedures as developed by Boeing. The publications program will incorporate and integrate the configuration data for Aircraft.

Performance data contained in the QRH for 757-200 / RB211-535E4 operation will be provided for Kilograms / Degrees C / Feet / Engine Inop / FAA regulations.

Boeing will determine the publications content and technical information to be incorporated in the Flight Crew Operations Manual which will be in accordance with Boeing established crew entry level for jet to jet transition.

Graphics guidelines and standards for the Flight Crew Operations Manual are as follows:

   (i)     Boeing original art work remains the possession of Boeing.

   (ii)    Boeing standards will be used for

         o   Instrument markings.

         o   Light displays.

         o   Fluid and pressure lines.

   (iii)   Boeing line weight standards, symbology, nomenclature, type styles and sizes, and numbering systems will be used throughout.

Boeing will provide the service of incorporating Boeing-originated changes to the Flight Crew Operations Manual and QRH. Such changes are referred to as "Revision Service". The Revision Service will include data such as new and improved operational practices, procedures as modified by operating experience, and configuration changes resulting from Boeing-originated engineering.

## Delivery

Boeing will provide Customer a digital copy of the Flight Crew Operations Manual and QRH, and periodic revision to the text and graphics thereof **(Data)**.

Boeing will provide one (1) copy of the Data in the specific format identified below.

The text Data on MyBoeingFleet.com will be stored in Structured Frame Files 10.0 or later. The graphic data is embedded in the individual files.

**EXHIBIT**

F

**FCOM and QRH Development and Revision Service - Services and Materials Order**

Revision Service will: commence upon completion of the Flight Crew Operations Manual and QRH, be provided for an approximate one (1) year period with temporary revisions as necessary for matters of an immediate nature and is renewable on an annual basis.

### Price

The price for the Data is Twenty-Four Thousand One Hundred Ten U.S. Dollars ($24,110.00).

### Payment

The terms for the payment category selected below are found in standard provision entitled "Payment Terms."

☒ Payment Due Upon Order Acceptance.
☐ Payment Due Upon Order Completion.

### Order Acceptance

Please accept this offer by inserting a purchase order number and date in the space provided below and return an electronic copy through BCS within fourteen (14) calendar days of the Issue Date cited on the first page of this offer; otherwise, this offer will expire. BY CITING CUSTOMER'S PURCHASE ORDER NUMBER IN THE SPACE PROVIDED BELOW AND RETURNING THIS OFFER TO BOEING IN THE PRESCRIBED MANNER, CUSTOMER AGREES TO THE TERMS OF THIS OFFER; INCLUDING THE "Boeing Technical Services - Standard Terms and Conditions." ALTERNATIVELY, IN LIEU OF PROVIDING THE PURCHASE ORDER NUMBER IN THE SPACE PROVIDED BELOW, CUSTOMER MAY CITE THE NUMBER IN THE SAME BCS MESSAGE REPLY THAT CUSTOMER USES TO ACCEPT THIS OFFER AND, THROUGH SUCH ACT, CUSTOMER AGREES TO THE TERMS OF THIS OFFER.

Return an electronic copy to Flight Technical Data through the Service Requests Application found on the MyBoeingFleet.com portal.

Questions may be directed to:
Flight Technical Data
Telephone Number:
(206) 662-4000

For reference: M-Z471-OP-1262

Swift Air LLC

S-1263
_____
Purchase Order Number

Date: APRIL 24
_____

Questions:

Raud WALTERS
Director, Operations
336.740.1533



# WINGSPAN AERO, LLC

*AIRCRAFT RECORDS, MAINTENANCE PROGRAMS, DIGITAL ARCHIVING*

Revision IR, dated 04-APR-2012

## TECHNICAL SERVICES AGREEMENT

| Customer Information | | Project Information | |
|---|---|---|---|
| **Company:** | Swift Aviation | **Aircraft Type:** | Boeing 757-200 |
| **Contact:** | TBD | **Aircraft Reg #:** | TBD |
| **Address:** | 2710 East Old Tower Road | **Aircraft SN:** | TBD |
| | Phoenix, AZ 85034 | **Aircraft LN:** | TBD |
| **Phone:** | 602-616-9968 | **Project Description:** | B757 MIP Development |
| **Fax:** | 602-275-4874 | **Estimated Start:** | TBD |
| **E-Mail:** | TBD | **Estimated Completion:** | Forty Five (45) Days |

### Description of Services to be provided

| Description | Fixed Bid |
|---|---|
| 1. Development of B757 MIP (See attached Description) | $45,000.00 |

### Additional Items

1. Project start date to be agreed upon by both parties
2. Project start date can be amended by Wingspan Aero, LLC based upon receipt of required documentation.

### Payment Terms

1. 50% of Fixed Bid is due prior to start of project ($22,500.00)
2. Remaining 50% is due at completion of project (prior to documentation delivery) ($22,500.00).
3. Bonus of $25,000.00 to be paid if project is completed within 30 days from official project start date. (Payment to be made prior to documentation delivery).
4. Wire transfer Instructions:
   **Wingspan Aero, LLC**
   Bank of Oak Ridge
   2211 Oak Ridge Road
   Oak Ridge, NC 27310
   Routing/ABA #: 053112327
   Account #: 1000027852

### Approvals

Terms and conditions that follow on attached pages are incorporated herein and expressly made a part hereof.

| Dated: | April 4, 2012 | Dated: | APR 4, 2012 |
|---|---|---|---|
| **WINGSPAN AERO:** | *Elizabeth A. Jorsey* | **Customer:** | |



EXHIBIT
G

Page 1 of 5

# TERMS AND CONDITIONS

## PROPOSAL DESCRIPTION

### DEVELOPMENT OF B757 MAINTENANCE INSPECTION PROGRAM

Development of a Boeing 757 Maintenance Inspection Program customized to specific aircraft as provided by Swift Air. This program will match the MPD interval requirements with no deviations. The program will be developed in WORD and EXCEL and then converted to PDF. The WORD, EXCEL and PDF documents will be provided upon the completion of the program. This program will include the following:

- Introduction
- Program Description
- Program Intervals
- Program Layout
- Check Tally's
- Task Cards with figures
- Panel Open and Close cards with figures
- RII Incorporation into Task Cards
- Time Limitations Table
- Master MPD Cross-Reference
- EWIS Cross-Reference
- EZAP Cross-Reference
- AWL Cross-Reference
- CAR (Continuous Airworthiness Requirements) Cross-Reference
- SSIP Tables
- FLS Tables

### DOCUMENTATION REQUIRED FROM SWIFT AIR:
- Boeing 757 MPD
- Boeing 757 MRB
- Boeing 757 Aircraft Specific AMM
- Boeing 757 Aircraft Specific IPC
- Boeing 757 Aircraft Specific (Boeing) Task Cards
- Rolls Royce RB211-535 Engine Manual
- Specific Aircraft Data Sheet (i.e. SN, DOM, VN, LN, Initial Operator, list of previous operators, etc).
- Specific Aircraft current Hours and Cycles
- Specific Aircraft Airframe, Appliance, Engine and APU AD Status Reports
- Specific Aircraft SB compliance Listing
- All ICA's for Modifications incorporated on specific aircraft
- Previous Operator's MIP or LDND Report
- Previous Operator's MIP Intervals
- Previous Operator's Reliability Program generated Tasks (I.e. additional (operator added) Tasks and/or deleted MPD Tasks)
- Previous Operator's Reliability Program generated Escalation's and De-Escalations of MPD Tasks
- Swift Air's proposed aircraft utilization
- Swift Air's proposed aircraft operational environment
- Swift Air's RII requirements Listing

# TERMS AND CONDITIONS

1. <u>SCOPE</u>

    (a) WINGSPAN AERO agrees to furnish to Customer the services and materials described on front page hereof (description of services), and Customer agrees to utilize WINGSPAN AERO to furnish such services and materials on a nonexclusive basis during the term of this Agreement. Customer agrees to pay for all such services and materials furnished or made available by WINGSPAN AERO at the rates, charges and payment terms set forth on front page hereof (description of services and payment terms).

    (b) During the term of this Agreement, WINGSPAN AERO agrees to furnish such additional services and materials upon such terms and conditions and payment terms as are agreed to by the parties in writing. Unless otherwise provided, the same rates, charges, and payment terms as are specified herein shall be applicable.

    (c) WINGSPAN AERO shall not be required to furnish any services or materials unless the Customer or an authorized Customer Representative in writing shall specify the same. All services and materials supplied or made available to or for the account of Customer during the term of this Agreement by WINGSPAN AERO shall be deemed supplied or made available pursuant to this Agreement.

    (d) Customer shall provide WINGSPAN AERO all available and current technical data, including Customer's approved manuals, microfilm and documentation as required by WINGSPAN AERO to perform the designated services. WINGSPAN AERO shall be entitled to rely upon the same data provided by Customer as being correct, current and applicable to the equipment to which the same has referenced.

2. <u>TECHNICAL SERVICES SUPPORT</u>

    (a) Customer shall maintain accurate records on each aircraft, and shall provide WINGSPAN AERO with all operational information which affect or might affect the inspection or time records compiled by WINGSPAN AERO pursuant to FAA regulations.

    (b) All work performed under this Agreement is based upon the available documentation provided by the Customer. WINGSPAN AERO will not be held responsible for validating the authenticity or accuracy of the documentation.

    (c) Customer is responsible to their regulatory agency. Therefore, the Customer is responsible to ensure the accuracy of the documentation provided by WINGSPAN AERO in the course of the Customer's audit processes.

3. <u>APPLICABLE LAW, JURISDICTION AND VENUE</u>

    (a) This Agreement, and the rights and obligations created hereunder, shall be governed by and construed according to the laws of the State of North Carolina unless any obligation hereunder shall be invalid or unenforceable under such laws, in which event the laws of the State whose law can apply to and validate the obligations under this Agreement shall apply. This Agreement shall be deemed executed in Reidsville, North Carolina.

    (b) UNLESS WAIVED BY WINGSPAN AERO IN WHOLE OR IN PART, THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NORTH CAROLINA SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ALL CLAIMS, DISPUTES, ACTIONS OR SUITS WHICH MAY ARISE FROM THIS AGREEMENT AND VENUE SHALL BE IN COURTS LOCATED IN ROCKINGHAM COUNTY, NORTH CAROLINA. CUSTOMER EXPRESSLY CONSENTS AND SUBMITS TO THE JURISDICTION OF SAID COURTS AND TO VENUE TO BEING IN ROCKINGHAM COUNTY, NORTH CAROLINA.

# TERMS AND CONDITIONS

## 4. INDEMNITY

(a) Customer agrees to defend, indemnify and hold harmless WINGSPAN AERO, its affiliates, officers, directors, servants, agents, and employees from and against any and all liabilities, losses, damages, demands, fines, penalties, and claims of any kind whatsoever, including all cost, expenses and reasonable attorney's fees incidental thereto, which may be suffered by, accrued against, chargeable to, or recoverable from WINGSPAN AERO as a result of injury to or death of any person, or damage to, loss or destruction of property arising out of Customers' or its' lessess possession, ownership, use, lease or operation of an aircraft maintained pursuant to this Agreement, except where such loss or damage results from the gross negligence or willful misconduct of WINGSPAN AERO.

(b) Limitation of Liability: Neither party hereto will be liable to the other for any special, consequential, incidental, or exemplary damages of any kind whatsoever arising out of or in connection with performance or failure to perform under this Agreement. No agreement varying or extending the foregoing Limitation of Liability will be binding upon either party unless in writing, signed by a duly authorized officer of that party.

## 5. ENFORCEMENT

The failure of either party to enforce any term of this Agreement shall not be deemed to void or affect the rights of such party with respect to enforcement of the same or any other term of this Agreement.

## 6. FINANCIAL SECURITY

In the event Customer becomes insolvent, ceases or suspends a substantial portion of its operations or takes material steps toward such suspension, files a voluntary petition in bankruptcy, makes assignment for the benefit of creditors of all or substantially all of its assets, or fails to secure dismissal of an involuntary petition in bankruptcy within thirty (30) days after the filing thereof, WINGSPAN AERO may then terminate this agreement upon five (5) days written notice or suspend it immediately until Customer provides adequate assurance of future performance under this Agreement by providing WINGSPAN AERO with an irrevocable letter of credit in an amount and with terms satisfactory to WINGSPAN AERO at its sole discretion. Any such suspension of further performance by WINGSPAN AERO will not be a breach of this Agreement and will not effect WINGSPAN AERO's right to pursue or enforce any of its rights under this Agreement or otherwise.

## 7. DEFAULT

(a) If Customer shall for any reason fail to perform any of the terms herein contained on its part to be performed and such failure shall continue for a period of five (5) days after notice to Customer by WINGSPAN AERO, WINGSPAN AERO shall have the right to pursue and enforce any one or more of the following remedies: (1) Terminate this Agreement immediately upon written notice without prejudice to its rights to exercise any other right or remedy available to it; (2) Recover all amounts due and owing under the terms of this Agreement; (3) Pursue any other remedy that WINGSPAN AERO may have hereunder, at law or in equity, or under any statute, in order to recover the actual damages that it has suffered.

(b) In the event any administrative, legal or other proceeding is instituted by either party to enforce the terms of this Agreement, the prevailing party shall, in addition to all other sums which may be due under the terms of this Agreement, be entitled to collect its reasonable costs, expenses and attorney fees.

(c) The failure of either party to exercise any of its rights as provided in this Agreement shall not be deemed a waiver of any other right or remedy such party may have under the terms of this Agreement and shall not be deemed a waiver of such party's rights resulting from any subsequent breach or default hereunder.

# TERMS AND CONDITIONS

## 8. FAILURE TO PERFORM

(a) If either party fails to perform its obligations under this Agreement and such failure to perform continues for a period of five (5) days after written notice to such party by the other party thereof (except in the case of nonpayment of monies due, wherein should such failure continue for a period of five (5) days after written notice to such party from the other party) the other party may terminate this Agreement immediately upon written notice. The right of each party to require strict performance of any obligations hereunder will not be affected in any way by any previous waiver, forbearance or course of dealing. If either party exercises its right to terminate hereunder such action will not effect or impair its right to bring suit for any default or breach of this Agreement, and no rights or causes of action will accrue to the defaulting party by reason of such termination.

(b) If either party terminates this Agreement as provided above, Customer will pay WINGSPAN AERO for any expenses WINGSPAN AERO may have incurred on behalf of Customer prior to such termination.

## 9. PAYMENT TERMS

This Agreement will be invoiced upon completion of services outlined in the description of services. Payment will be due as outlined in payment terms.

## 10. MISCELLANEOUS

(a) WINGSPAN AERO shall not be responsible for any failure or delay in its performance of the work due to causes beyond its reasonable and commercially practicable control including, but no limited to, labor disputes, war, orders or decisions of governmental officials, shortage of materials, or acts of God.

(b) If Customer fails to perform any of the terms herein contained or becomes insolvent, ceases or suspends a substantial portion of its operation or takes material steps toward the same or files or has filed against it a petition in bankruptcy or makes assignment for the benefit of creditors, WINGSPAN AERO may immediately terminate this Agreement and pursue all remedies hereunder, at law, in equity or otherwise.

(c) If WINGSPAN AERO fails to perform any of the terms herein contained or becomes insolvent, ceases or suspends a substantial portion of its operation or takes material steps toward the same or files or has filed against it a petition in bankruptcy or makes assignment for the benefit of creditors, the Customer may immediately terminate this Agreement and pursue all remedies hereunder, at law, in equity or otherwise.



June 7, 2012

Mr. Reid S. Walburg
Acting Manager
Federal Aviation Management Office
Phoenix Certificate Management Office
2800 N. 44th Street, Suite 450
Phoenix, AZ 85008

RE: Correction to Letter of Request per 119.51 (c) to amend OPS SPEC dated March 29, 2012

Dear Reid,

As discussed per our telephone conversation, I would kindly request to amend my letter dated March 29, 2012.

After further review, we have determined that the CASS Manual does not require to be updated for adding the Boeing 757 to Swift's OPS SPEC.

Secondly, we request to submit our revised Weight and Balance Manual as soon as we obtain the weight and balance substantiation from our vendor, American Aeronautics. The revision of the weight and balance manual will add a new Appendix including the load analysis for the B757. The load analysis report requires an Basic Empty Weight what we have not yet received. Upon receipt of the approved data, American Aeronautics can generate the report within 5 business days. Swift would be able to submit the revised manual upon receipt of the load report. As I explained per our conversation, the load report is a stand-alone section in the manual that serves the purpose of substantiation, ensuring that we are able to operate the aircraft within the aircraft's certificated envelope. No other manuals interface with the load report, therefore I kindly request to consider our manual submission complete enabling your inspectors to start their review.

Sincerely,

Boris van Lier
COO
Swift Air, LLC

CC:    Rand Walters
       Linnon Latham

2406 S. 24th Street, Suite E-102
Phoenix, Arizona 85034
U.S.A.
Phone (602)273-3770
www.swiftaviationgroup.com



| | |
|---|---|
| **From:** | Boris Van Lier |
| **Sent:** | Tuesday, May 22, 2012 9:53 PM |
| **To:** | Adam Ferguson (adferguson1@me.com) |
| **Cc:** | Jeff Conry (jgconry@gmail.com) |
| **Subject:** | FW: Financials |
| **Attachments:** | Swift_April Financials.pdf |

**From:** Jeff Conry [mailto:jgconry@gmail.com]
**Sent:** Tuesday, May 22, 2012 6:50 PM
**To:** Boris Van Lier
**Subject:** Financials

BVL. Send this to Adam. Please copy me. Rgds.jc



DEF 5221

Income Statement
Selected Periods, 2012                    *UNAUDITED*

Swift Air, L.L.C. (LLC)

| DRAFT | January | | February | | March | | April | | Year to Date | | Variance Mar-Apr Favorable/(Unfavorable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales & Services** | | | | | | | | | | | | |
| Management Fee Revenue | 16,535 | 0.5% | 22,150 | 0.7% | 26,850 | 0.7% | 21,300 | 0.7% | 86,835 | 0.6% | (5,550) | -20.7% |
| Management Crew Revenue | 8,089 | 0.2% | - | 0.0% | - | 0.0% | - | 0.0% | 8,089 | 0.1% | - | 0.0% |
| Charter Revenue - NHL | 891,251 | 24.8% | 992,259 | 32.9% | 1,080,014 | 28.6% | 541,853 | 17.8% | 3,505,377 | 26.1% | (538,161) | -49.8% |
| Charter Revenue - NBA | 1,765,789 | 49.2% | 1,214,207 | 40.3% | 1,530,504 | 40.6% | 1,376,505 | 45.3% | 5,887,005 | 43.9% | (153,999) | -10.1% |
| Charter Revenue - Ad-Hoc | 602,983 | 16.8% | 523,837 | 17.4% | 807,148 | 21.4% | 859,220 | 28.3% | 2,793,188 | 20.8% | 52,072 | 6.5% |
| Fuel Revenue | 137,235 | 3.8% | 167,159 | 5.5% | 168,751 | 4.5% | 134,561 | 4.4% | 607,706 | 4.5% | (34,190) | -20.3% |
| Catering Revenue | 118,414 | 3.3% | 89,327 | 3.0% | 153,544 | 4.1% | 100,648 | 3.3% | 461,933 | 3.4% | (52,896) | -34.5% |
| Screening Revenue | - | 0.0% | 6,689 | 0.2% | 5,935 | 0.2% | 1,150 | 0.0% | 13,774 | 0.1% | (4,785) | -80.6% |
| Other Revenue | 47,628 | 1.3% | | 0.0% | (3,000) | -0.1% | 25 | 0.0% | 44,653 | 0.3% | 3,025 | -100.8% |
| Aircraft Stock/Supplies Sales | 602 | 0.0% | | 0.0% | 427 | 0.0% | 422 | 0.0% | 1,451 | 0.0% | (5) | -1.2% |
| **Total Sales:** | 3,588,526 | 100.0% | 3,015,628 | 100.0% | 3,770,173 | 100.0% | 3,035,684 | 100.0% | 13,410,011 | 100.0% | (734,489) | -24.4% |
| **Cost Of Sales** | | | | | | | | | | | | |
| Charter Sales Commission | 110,702 | 3.1% | 78,739 | 2.6% | 112,660 | 3.0% | 97,901 | 3.2% | 400,002 | 3.0% | 14,759 | 13.1% |
| Leased Aircraft | 340,090 | 9.5% | 340,090 | 11.3% | 340,091 | 9.0% | 340,090 | 11.2% | 1,360,361 | 10.1% | 1 | 0.0% |
| Fuel | 1,169,340 | 32.6% | 951,893 | 31.6% | 1,447,310 | 38.4% | 1,027,143 | 33.8% | 4,595,686 | 34.3% | 420,167 | 29.0% |
| Landing | 44,139 | 1.2% | 36,149 | 1.2% | 54,108 | 1.4% | 58,195 | 1.9% | 192,591 | 1.4% | (4,087) | -7.6% |
| Ground Handling | 220,030 | 6.1% | 278,320 | 9.2% | 355,977 | 9.4% | 261,418 | 8.6% | 1,115,745 | 8.3% | 94,559 | 26.6% |
| Deicing | 94,257 | 2.6% | 6,774 | 0.2% | 7,601 | 0.2% | (7,723) | -0.3% | 100,909 | 0.8% | 15,324 | 201.6% |
| Screening | 101,367 | 2.8% | 69,088 | 2.3% | 95,788 | 2.5% | 76,466 | 2.5% | 342,709 | 2.6% | 19,322 | 20.2% |
| International Expenses | 77,169 | 2.2% | 20,501 | 0.7% | 36,805 | 1.0% | 48,443 | 1.6% | 182,918 | 1.4% | (11,638) | -31.6% |
| Catering | 217,019 | 6.0% | 121,097 | 4.0% | 252,026 | 6.7% | 136,849 | 4.5% | 726,991 | 5.4% | 115,177 | 45.7% |
| Aircraft Stock/Supplies | 13,461 | 0.4% | 30,479 | 1.0% | 16,535 | 0.4% | 16,886 | 0.6% | 77,361 | 0.6% | (351) | -2.1% |
| SubService | 382,160 | 10.6% | 372,148 | 12.3% | 137,563 | 3.6% | 206,198 | 6.8% | 1,098,069 | 8.2% | (68,635) | -49.9% |
| Unscheduled Maintenance | 12,349 | 0.3% | 69,540 | 2.3% | 43,037 | 1.1% | 25,429 | 0.8% | 150,355 | 1.1% | 17,608 | 40.9% |
| Scheduled Maintenance | 37,253 | 1.0% | 3,589 | 0.1% | 66,894 | 1.8% | 2,437 | 0.1% | 110,173 | 0.8% | 64,457 | 96.4% |
| Aircraft Maintenance Reserves | 64,620 | 5.3% | 36,135 | 1.2% | 54,060 | 1.4% | 55,140 | 1.8% | 209,955 | 1.6% | (1,080) | -2.0% |
| Aircraft Insurance | 150,384 | 4.2% | 142,044 | 4.7% | 150,516 | 4.0% | 150,516 | 5.0% | 593,460 | 4.4% | - | 0.0% |
| Aircraft Cleaning | 1,445 | 0.0% | 4,376 | 0.1% | | 0.0% | 400 | 0.0% | 6,221 | 0.0% | (400) | 0.0% |
| Leased Employees-Pilots | 172,571 | 4.8% | 132,105 | 4.4% | 194,082 | 5.1% | 195,744 | 6.4% | 694,502 | 5.2% | (1,662) | -0.9% |
| Leased Employees-F/A | 123,709 | 3.4% | 87,932 | 2.9% | 108,368 | 2.9% | 122,538 | 4.0% | 442,547 | 3.3% | (14,170) | -13.1% |
| Leased Employees-Flight Mechanics | 57,825 | 1.6% | 50,125 | 1.7% | 35,852 | 1.0% | 54,396 | 1.8% | 198,198 | 1.5% | (18,544) | -51.7% |
| Leased Employees-Operations | 55,511 | 1.5% | 35,020 | 1.2% | 56,942 | 1.5% | 51,328 | 1.7% | 198,801 | 1.5% | 5,614 | 9.9% |
| Other Employee Expenses - Crew | 1,266 | 0.0% | 1,427 | 0.0% | 882 | 0.0% | 1,583 | 0.1% | 5,158 | 0.0% | (701) | -79.5% |
| Crew Training Wages - Pilots | | 0.0% | 37,447 | 1.2% | 10,618 | 0.3% | | | 48,065 | 0.4% | 10,618 | 0.0% |
| Crew Training Wages - F/A | | 0.0% | 5,500 | 0.2% | 16,902 | 0.4% | | | 22,402 | 0.2% | 16,902 | 0.0% |
| Crew Training Expense | 1,400 | 0.0% | 36,484 | 1.2% | 37,010 | 1.0% | 20,804 | 0.7% | 95,698 | 0.7% | 16,206 | 43.8% |
| Crew Training Travel | 3,375 | 0.1% | 20,477 | 0.7% | 4,822 | 0.1% | 9,395 | 0.3% | 38,069 | 0.3% | (4,573) | -94.8% |
| Crew Lodging | 89,401 | 2.5% | 90,515 | 3.0% | 97,130 | 2.6% | 95,136 | 3.1% | 372,182 | 2.8% | 1,994 | 2.1% |
| Crew Positioning & Transportation | 90,067 | 2.5% | 46,826 | 1.6% | 66,484 | 1.8% | 64,180 | 2.1% | 267,557 | 2.0% | 2,304 | 3.5% |
| Crew Per Diem | | 0.0% | 20,952 | 0.7% | 29,948 | 0.8% | 26,359 | 0.9% | 77,259 | 0.6% | 3,589 | 12.0% |
| Crew Catering | 1,190 | 0.0% | 2,760 | 0.1% | 846 | 0.0% | 122 | 0.0% | 4,918 | 0.0% | 724 | 85.6% |
| Crew Uniforms | 222 | 0.0% | (327) | 0.0% | 2,374 | 0.1% | 299 | 0.0% | 2,568 | 0.0% | 2,075 | 87.4% |
| Nav Aides and Charts | 10,613 | 0.3% | 5,059 | 0.2% | 14,374 | 0.4% | 9,694 | 0.3% | 39,740 | 0.3% | 4,680 | 32.6% |
| Miscellaneous Expense | | 0.0% | 320 | 0.0% | | 0.0% | 320 | 0.0% | 320 | 0.0% | - | 0.0% |
| **Total Cost Of Sales:** | 3,642,935 | 105.0% | 3,133,584 | 103.9% | 3,847,604 | 102.1% | 3,147,366 | 103.7% | 13,771,489 | 102.7% | 700,238 | 22.3% |
| **Gross Profit:** | (54,409) | -5.0% | (117,956) | -3.9% | (77,431) | -2.1% | (111,682) | -3.7% | (361,478) | -2.7% | (34,251) | -44.2% |

DEF   5222

### Expenses

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Management Fees | 54,000 | 1.5% | | 0.0% | - | 0.0% | 76,000 | 2.5% | 130,000 | 1.0% | (76,000) | 0.0% |
| Leased Employees-Administration | 96,006 | 2.7% | 77,184 | 2.6% | 108,277 | 2.9% | 105,339 | 3.5% | 386,806 | 2.9% | 2,938 | 2.7% |
| Leased Employees-Maintenance | 41,935 | 1.2% | 32,097 | 1.1% | 45,127 | 1.2% | 47,218 | 1.6% | 166,377 | 1.2% | (2,091) | -4.6% |
| Employee Benefits/Employment Expenses | 1,010 | 0.0% | 399 | 0.0% | 795 | 0.0% | 2,080 | 0.1% | 4,284 | 0.0% | (1,285) | -161.6% |
| Training - Admin/Scheduling | 320 | 0.0% | 320 | 0.0% | 320 | 0.0% | 125 | 0.0% | 1,085 | 0.0% | 195 | 60.9% |
| Training - Maintenance | 182 | 0.0% | | 0.0% | | 0.0% | | 0.0% | 182 | 0.0% | 182 | 0.0% |
| 121 Fuel/Deice Audits | | 0.0% | 5,962 | 0.2% | 1,226 | 0.0% | 1,265 | 0.0% | 8,453 | 0.1% | (39) | -3.2% |
| Uniforms - Mtce | | 0.0% | (50) | 0.0% | | 0.0% | | 0.0% | (50) | 0.0% | - | 0.0% |
| Tool Calibration - Mtce | | 0.0% | (635) | 0.0% | | 0.0% | | 0.0% | (635) | 0.0% | - | 0.0% |
| Maintenance Parts & Labor/Supplies | 2,454 | 0.1% | | 0.0% | 2,521 | 0.1% | 310 | 0.0% | 5,285 | 0.0% | 2,211 | 87.7% |
| Manuals & Publications | | 0.0% | 10,657 | 0.4% | 18,806 | 0.5% | 22,158 | 0.7% | 51,621 | 0.4% | (3,352) | -17.8% |
| Dues & Subscriptions | 233 | 0.0% | 7,857 | 0.3% | 13 | 0.0% | | 0.0% | 8,103 | 0.1% | 13 | 0.0% |
| Rent Expense | 11,209 | 0.6% | 11,209 | 0.4% | 11,209 | 0.3% | 12,952 | 0.4% | 46,579 | 0.3% | (1,743) | -15.6% |
| Office Expense | 3,131 | 0.1% | 4,543 | 0.2% | 4,387 | 0.1% | 3,549 | 0.1% | 15,610 | 0.1% | 838 | 19.1% |
| Freight & Delivery | 854 | 0.0% | 248 | 0.0% | 2,207 | 0.1% | 1,750 | 0.1% | 5,059 | 0.0% | 457 | 20.7% |
| Telephone Expense | 18,238 | 0.5% | 16,332 | 0.5% | 14,276 | 0.4% | 17,598 | 0.6% | 66,444 | 0.5% | (3,322) | -23.3% |
| Computer/Networking Expense | 852 | 0.0% | 911 | 0.0% | 2,091 | 0.1% | 1,330 | 0.0% | 5,184 | 0.0% | 761 | 36.4% |
| Bank Fees | 2,406 | 0.1% | 3,520 | 0.1% | 1,160 | 0.0% | 1,754 | 0.1% | 8,840 | 0.1% | (594) | -51.2% |
| Finance Charges | 461 | 0.1% | 8,686 | 0.3% | 16,483 | 0.1% | 29,693 | 0.1% | 55,323 | 0.1% | (13,210) | -80.1% |
| Travel - Admin, Mtce | 15,074 | 0.4% | 17,273 | 0.6% | 8,516 | 0.2% | 9,589 | 0.3% | 50,452 | 0.4% | (1,073) | -12.6% |
| Commuting - Admin | 1,282 | 0.0% | | 0.0% | | 0.0% | | 0.0% | 1,282 | 0.0% | | 0.0% |
| Meals & Entertainment - Admin, Mtce | (127) | 0.0% | 99 | 0.0% | 380 | 0.0% | 2,309 | 0.1% | 2,661 | 0.0% | (1,929) | -507.6% |
| Outside Services | 8,899 | 0.2% | 2,167 | 0.1% | 11,750 | 0.3% | 2,872 | 0.1% | 25,688 | 0.2% | 8,878 | 75.6% |
| Legal & Accounting | | 0.0% | 3,035 | 0.1% | 5,793 | 0.2% | 16,617 | 0.5% | 25,445 | 0.2% | (10,824) | -186.8% |
| Marketing & Advertising | 1,649 | 0.0% | 1,129 | 0.0% | 1,129 | 0.0% | 1,129 | 0.0% | 5,036 | 0.0% | - | 0.0% |
| Licence & Permits | 15 | 0.0% | | 0.0% | 2,280 | 0.1% | 3,938 | 0.1% | 6,233 | 0.0% | (1,658) | -72.7% |
| Insurance Expense - Indirect | | 0.0% | 333 | 0.0% | | 0.0% | | 0.0% | 333 | 0.0% | - | 0.0% |
| Bad Debt Expense | 2,500 | 0.1% | (3,183) | -0.1% | 2,500 | 0.1% | 2,500 | 0.1% | 4,317 | 0.0% | - | 0.0% |
| Other Income/Expense | 10,477 | 0.3% | 5,052 | 0.2% | 8,425 | 0.2% | 38,345 | 1.3% | 62,299 | 0.5% | (29,920) | -355.1% |
| Total Expenses: | 273,060 | 7.9% | 205,145 | 6.8% | 269,671 | 7.2% | 400,420 | 13.2% | 1,148,296 | 8.6% | (130,749) | -48.5% |
| Net Income From Operations Before Interest, Taxes, Depreciation & Amortization: | (327,469) | -12.9% | (323,101) | -10.7% | (347,102) | -9.2% | (512,102) | -16.9% | (1,509,774) | -11.3% | (24,001) | -7.4% |
| Interest Expense | | 0.0% | | 0.0% | - | 0.0% | | 0.0% | - | 0.0% | | 0.0% |
| Interest Expense Note Payable JV | | 0.0% | 1,003 | 0.0% | 4,713 | 0.1% | 15,796 | 0.5% | 21,512 | 0.2% | (11,083) | -235.2% |
| Depreciation & Amortization | 11,161 | 0.0% | 11,338 | 0.4% | 11,151 | 0.3% | 2,412 | 0.1% | 36,062 | 0.3% | 8,739 | 78.4% |
| Net Income (Loss): | (338,630) | -13.2% | (335,442) | -11.1% | (362,966) | -9.6% | (530,310) | -17.5% | (1,567,348) | -11.7% | (167,344) | -46.1% |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Live | 210.9 | 60% | 172.4 | 60% | 251.7 | 66% | 224.1 | 74% | 859.1 | 65% |
| Ferry | 140.7 | 40% | 113.1 | 40% | 128.4 | 34% | 78.6 | 26% | 460.8 | 35% |
| Total Hours (Block) | 351.6 | 100% | 285.5 | 100% | 380.1 | 100% | 302.7 | 100% | 1,319.9 | 100% |
| Segments | 151 | | 131 | | 174 | | 127 | | 583 | |
| Live Segments | 93 | | 79 | | 114 | | 91 | | 377 | |
| Flt Rev/Hr | 9,271.97 | | 9,563.23 | | 8,991.49 | | 9,176.01 | | 9,232.19 | |
| Flt Rev/Live Hr | 15,457.67 | | 15,837.02 | | 13,578.33 | | 12,394.37 | | | |
| TTL Rev/Hr | 10,206.27 | | 10,562.62 | | 9,918.90 | | 10,028.69 | | 10,159.87 | |
| CGS/Hr | 10,361.02 | | 10,975.78 | | 10,122.61 | | 10,397.64 | | 10,433.74 | |
| GP/HR | (154.75) | | (413.16) | | (203.71) | | (368.95) | | (273.87) | |
| Fuel/Hr | 3,325.77 | | 3,334.13 | | 3,807.71 | | 3,393.27 | | 3,481.84 | |
| Ground/Segment | 1,457.15 | | 2,124.58 | | 2,045.84 | | 2,058.41 | | 1,913.80 | |
| Screening/Live Segment | 1,089.97 | | 874.53 | | 840.25 | | 840.29 | | 909.04 | |
| Catering/Live Segment | 2,333.54 | | 1,532.87 | | 2,210.75 | | 1,503.84 | | 1,928.36 | |

DEF  5223

Comparative Balance Sheet
Selected Periods, 2012

Swift Air, L.L.C. (LLC)

DRAFT

| | January 31st | February 29th | March 31st | April 30th |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current Assets** | | | | |
| Cash in Checking | 140,295.81 | 31,925.11 | 765,266.06 | 405,706.14 |
| Cash in Escrow | 2,426,254.07 | 2,651,655.14 | 2,285,814.57 | 1,651,368.58 |
| Petty Cash | 250.00 | 250.00 | 250.00 | 250.00 |
| Accounts Receivable (Net) | 551,484.32 | 361,397.84 | 211,008.98 | 492,257.36 |
| Accrued Revenue | 438,632.64 | 100,076.67 | 568,461.64 | 229,814.12 |
| Other Receivables | 181,738.07 | 152,878.70 | 198,307.42 | 107,017.48 |
| Security Deposits | 4,020.00 | 4,020.00 | 4,020.00 | 4,020.00 |
| Employee Advances | 4,095.28 | 3,540.60 | 4,389.58 | 2,542.87 |
| Prepaid Expenses | 339,792.45 | 310,556.59 | 245,040.61 | 557,240.71 |
| Inventories | 163,409.22 | 163,858.90 | 163,458.90 | 163,385.87 |
| Total Current Assets: | 4,249,971.86 | 3,780,159.55 | 4,446,017.76 | 3,613,603.13 |
| **Fixed Assets** | | | | |
| Office Equipment & Software | 325,102.59 | 327,992.59 | 329,036.67 | 329,036.67 |
| Leasehold Improvements - Remodeling | 16,488.35 | 16,488.35 | 16,488.35 | 16,488.35 |
| Accumulated Depreciation - Off Equip & Software | (275,070.85) | (277,886.43) | (280,684.68) | (282,844.83) |
| Accumulated Amortization - Remodeling | (14,095.12) | (14,221.09) | (14,221.09) | (14,473.03) |
| Managed Aircraft Certification Costs - 250MY | 394,306.19 | 25,508.15 | 70,797.85 | 77,624.90 |
| Managed Aircraft Certification Costs - 757/Tan | | | | 21,691.24 |
| Managed Aircraft Certification Costs - 767MW | 134,291.13 | 134,291.13 | 134,291.13 | 134,291.13 |
| Accum Amort-A/C Cert 250MY | (374,469.57) | | | |
| Accum Amort-A/C Cert 767MW | (117,541.90) | (125,937.75) | (134,291.13) | (134,291.13) |
| Startup Costs - 121 Certificate | 1,484,267.83 | 1,484,267.83 | 1,484,267.83 | 1,484,267.83 |
| Accumulated Amortization - Startup Costs | (1,484,267.83) | (1,484,267.83) | (1,484,267.83) | (1,484,267.83) |
| Total Fixed Assets: | 89,010.82 | 86,234.95 | 121,417.10 | 147,523.30 |
| **Other Assets** | | | | |
| Aircraft Deposits - B757/Tan | | | | 176,000.00 |
| Total Other Assets: | - | - | - | 176,000.00 |
| Total Assets: | $ 4,338,982.68 | $ 3,866,394.50 | $ 4,567,434.86 | $ 3,937,126.43 |
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| Accounts Payable | 3,406,030.06 | 3,475,705.53 | 3,547,976.15 | 3,342,277.09 |
| Accrued Payroll | 60,114.07 | 76,852.60 | 128,013.69 | 154,297.23 |
| Accrued Vacation Expense | 250,680.74 | 186,072.95 | 181,793.37 | 181,793.37 |
| Accrued Aircraft Reserves | 166,947.40 | 102,327.40 | 156,387.40 | 102,327.40 |
| Other Accrued Expenses | 585,871.58 | 272,470.70 | 459,570.71 | 267,510.54 |
| Federal Transportation Taxes Payable | 181,893.63 | 34,110.00 | 53,532.30 | 68,935.80 |
| Customer Deposits - 121 Charter Flights | 2,390,418.74 | 2,617,268.51 | 2,251,837.77 | 1,619,475.78 |
| Customer Deposit - EZ Jet | | | | 75,000.00 |
| Customer Deposit - Tan Holdings | | | | 900,000.00 |
| Total Current Liabilities: | 7,041,956.22 | 6,764,807.69 | 6,779,111.39 | 6,711,617.21 |
| **Long-Term Liabilities** | | | | |
| Federal Transportation Taxes - Long Term | 1,752,631.58 | 1,704,699.25 | 1,704,699.25 | 1,656,399.09 |
| Note Payable - JV | | 488,000.00 | 1,533,000.00 | 1,533,000.00 |
| Accrued Interest - Note Payable JV | | 1,003.39 | 5,716.15 | 21,512.30 |
| Total Long-Term Liabilities: | 1,752,631.58 | 2,193,702.64 | 3,243,415.40 | 3,210,911.39 |
| Total Liabilities: | 8,794,587.80 | 8,958,510.33 | 10,022,526.79 | 9,922,528.60 |
| **Members' Equity** | | | | |
| Member Distribution - Seller | 1,673,642.27 | 1,372,748.92 | 1,372,748.92 | 1,372,748.92 |
| Member Distributions - Current | (5,000.00) | (5,000.00) | (5,000.00) | (5,000.00) |
| Retained Earnings | (5,785,626.67) | (5,785,626.67) | (5,785,626.67) | (5,785,626.67) |
| Retained Earnings-Current Year | (338,620.72) | (674,238.08) | (1,037,214.18) | (1,567,524.42) |
| Total Members' Equity: | (4,455,605.12) | (5,092,115.83) | (5,455,091.93) | (5,985,402.17) |
| Total Liabilities & Members' Equity: | $ 4,338,982.68 | $ 3,866,394.50 | $ 4,567,434.86 | $ 3,937,126.43 |

DEF  5224

Comparative Statement of Cash Flows
Selected Periods, 2012                                    *UNAUDITED*

Swift Air, L.L.C. (LLC)

| DRAFT | January 1-31 | February 1-29 | March 1-31 | April 1-30 |
|---|---|---|---|---|
| Cash Flows from Operating Activities: | | | | |
| Net Income/(Loss) | (338,620.72) | (335,617.36) | (322,976.10) | (490,310.24) |
| Add/(Deduct) non-cash items: | | | | |
| Change in Restricted Funds | (333,426.31) | (225,401.07) | 365,840.57 | 634,445.99 |
| Change in Accounts Receivable | 109,042.04 | 190,086.48 | 150,388.86 | (281,248.38) |
| Change in Accrued Revenue | | 338,555.97 | (468,384.97) | 338,647.52 |
| Change in Other Receivables | (537,187.55) | 28,859.37 | (45,428.72) | 91,289.94 |
| Change in Prepaid Expenses | (212,546.45) | 29,235.86 | 65,515.98 | (312,200.10) |
| Change in Inventories | | (449.68) | 400.00 | 73.03 |
| Depreciation & Amortization | 11,161.25 | 11,337.40 | 11,151.63 | 2,412.09 |
| Change in Accounts Payable | 675,894.01 | 69,675.47 | 72,270.62 | (205,699.06) |
| Change in Accrued Expenses | 353,009.86 | (572,670.38) | 265,222.74 | (244,433.13) |
| Change in Customer Deposits | 334,391.52 | 226,849.77 | (365,430.74) | 342,638.01 |
| Change in Accrued LT Taxes | (54,919.80) | (47,932.33) | 6,953.84 | (48,300.16) |
| Change in Accrued Interest | | | | 15,796.15 |
| Other (net) | (321.10) | 554.68 | (848.98) | 1,846.71 |
| Net Cash provided from Operating Activities | 6,476.75 | (286,915.82) | (265,325.27) | (155,041.63) |
| | | | | |
| Cash Flows from Investing Activities: | | | | |
| Office Equipment & Software | (6,790.19) | (2,890.00) | (1,044.08) | |
| Aircraft Certification Costs | | (5,671.53) | (45,289.70) | (28,518.29) |
| Aircraft Deposits | | | | (176,000.00) |
| Net Cash provided from Investing Activities | (6,790.19) | (8,561.53) | (46,333.78) | (204,518.29) |
| | | | | |
| Cash flows from Financing Activities: | | | | |
| Change in Note Payable - JV | | 488,000.00 | 1,045,000.00 | |
| Member Distributions | (5,000.00) | | | |
| Member Distributions - Seller (correction) | | (300,893.35) | | |
| Net Cash provided from Financing Activities | (5,000.00) | 187,106.65 | 1,045,000.00 | - |
| Net Increase/(Decrease) in Cash | (5,313.44) | (108,170.70) | 733,340.95 | (359,559.92) |
| Cash Balance, Beginning of Month | 145,609.25 | 140,295.81 | 31,925.11 | 765,266.06 |
| Cash Balance, End of Month | 140,295.81 | 31,925.11 | 765,266.06 | 405,706.14 |

DEF   5225