IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

SAIPAN AIR, INC.,

        Plaintiff,

    v.

DONALD A. STUKES, JEFFREY CONRY,
and BORIS VAN LIER,

        Defendants.

CASE NO.  1:12-CV-00015

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Before the Court is a motion for summary judgment ("MSJ," ECF No. 66) by Defendants Donald A. Stukes ("Stukes"), Jeffrey Conry ("Conry"), and Boris Van Lier (Van Lier") with respect to all claims asserted by Plaintiff Saipan Air, Inc. ("Saipan Air"). Those claims are (1) fraud, (2) violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.,* and (3) unjust enrichment. (*See* First Amended Complaint ("FAC"), ECF No. 2.) After a full briefing, the matter came on for a hearing on October 30, 2014. Having considered all the papers, evidence, and arguments submitted by the parties in support of and opposition to the MSJ, [1] the Court enters the following Order.

---

[1] Memorandum of Law in Support of Defendants' Motion for Summary Judgment, ECF No. 66-1 ("MSJ Memo"); Ex. A, Transcript of Deposition of Adam Ferguson, ECF No. 66-2 ("Ferguson Depo."); Declaration of Jeffrey Conry, ECF No. 66-3 ("Conry Decl."); Declaration of Boris Van Lier, ECF No. 66-4 (Van Lier Decl."); Saipan Air Inc.'s Opposition, ECF No. 71 ("Opp'n"); Ex. 1, Declaration of Adam Ferguson, ECF No. 71-1 ("Ferguson Decl."); Ex. 2, Declaration of Glicerio Arago, ECF No. 71-2 ("Arago Decl."); Ex. 3, Declaration of Steven P. Pixley, ECF No. 71-3; Excerpts of Deposition of Donald A. Stukes, ECF Nos. 71-3 and 71-4 ("Stukes Depo."); Excerpts of Deposition Transcript of Shane Nail, ECF No. 71-4 ("Nail Depo."); Excerpts of Deposition Transcript of Kevin Burdette, ECF No. 71-4 ("Burdette Depo."); Excerpts of Deposition Transcript of Laurie Leroux, ECF No. 71-4 ("Leroux Depo."); Videotaped Deposition of Nick Huska [transcript], ECF No. 71-4; Deposition Transcript of Gregg Lukenbill, ECF Nos. 71-4 and 71-5 ("Lukenbill Depo."); Ex. 4, Letter from Stukes to Torbert, June 23, 2012, ECF No. 71-6; Ex. 5, Declaration of Mark Welch, ECF No. 71-7; Ex. 6, Declaration of Jim Rogers, ECF No. 71-8

1

## II.     BACKGROUND

Saipan Air was established in November 2011 to provide air transportation between the Commonwealth of the Northern Mariana Islands ("Commonwealth" or "CNMI") and various locations in Japan and China. (Ferguson Decl. ¶ 3.) It solicited proposals for a "wet lease" agreement to provide aircraft, crew, maintenance, and insurance ("ACMI"). (*Id.* ¶¶ 4, 5.) On or about December 12, 2011, Conry telephoned Adam Ferguson, Saipan Air's chief operating officer. (*Id.* ¶¶ 3, 6.) Conry falsely identified himself as the new owner of Swift Air and informed Ferguson that Swift Air was interested in providing "lift" for Saipan Air. (*Id.* ¶ 6.) In another call in December, Conry represented to Ferguson that Avondale Ventures ("Avondale") would be the primary source of investment in Swift Air, and that Avondale represented a portfolio of $70 million in assets. (*Id.* ¶ 7.) In fact, Avondale's net worth was only $3 million. (Stukes Decl., p. 77.)

On December 15, 2011, Conry called and told Ferguson that Boris Van Lier, chief operating officer of Dynamic Air, was leaving Dynamic Air to join Swift Air. (*Id.* ¶ 8.) Dynamic Air had previously submitted a proposal to Saipan Air, and the two companies had been in communication. (*Id.*) Ferguson believes that Van Lier divulged this information to Conry. (*Id.*)

On or about December 21, 2011, Avondale and Stukes acquired Swift Air from Jerry Moyes for no consideration. (Stukes Depo., pp. 57–58.) Avondale acquired a 90 percent interest, and Stukes acquired a 10 percent interest. (*Id.*) According to Ken Burdette, vice president of Swift Air before the sale, Stukes misrepresented that he brought $5 million in financing to the

---

("Rogers Decl."); Ex. 7, Email from Stukes to Huska, June 27, 2012, ECF No. 71-9; Defendants' Reply, ECF No. 74; Ex. A, Saipan Air's Response to Defendants' First Set of Interrogatories, ECF No. 74-1.

1   table. (Burdette Depo., p. 68.) After the purchase closed, Conry designated Van Lier COO of

2   Swift Air. (*Id.*, p. 61.)

3       On or about January 11, 2012, Van Lier traveled to Saipan and gave a presentation to

4   Saipan Air representatives concerning Swift Air's interest in providing lift service. (Van Lier

5   Decl. ¶ 3; Ferguson Decl. ¶ 10.) Sometime prior to the Saipan trip, Laurie Leroux, a Swift Air

6   employee, overheard a phone conversation in which Van Lier told Ferguson the aircraft would

7   be available on the start date. (Leroux Depo., p. 29.) At her deposition, Leroux testified that in

8   her "heart of hearts I knew that it wasn't going to happen." (*Id.*, pp. 29–30). She felt that Van

9   Lier was lying to Ferguson. (*Id.*, pp. 30, 43.)

10      On January 18, Ferguson told Van Lier that Saipan Air had decided not to proceed with

11  Swift Air. (Ferguson Decl. ¶ 11.)

12      On January 31, 2012, Van Lier sent Ferguson an e-mail inquiring into the status of

13  Saipan Air's program. (*Id.* ¶ 12.) Ferguson didn't respond until March 10. (*Id.*)

14      On March 21, Ferguson traveled from Guam to Phoenix, Arizona, to meet with Conry

15  and Van Lier. (*Id.* ¶ 13; Van Lier Decl. ¶ 7.) Ferguson asked to review Swift Air's financial

16  records, but was told that full and complete records were unavailable. (Ferguson Decl. ¶ 13.)

17  Instead, Ferguson was shown unaudited pro formas that indicated Swift Air had very little debt.

18  (*Id.*) Conry and Van Lier reiterated that Avondale was funding Swift Air with an owner with a

19  $70 million portfolio. (*Id.*) They gave assurances that Swift Air was fully capable of supporting

20  Saipan Air's program. (*Id.*) Ferguson learned later that Swift Air had significant debt, including a

21  $1.6 million tax lien and a $900,000 judgment for nonperformance on a contract. (*Id.*)

22

23

24                                        3

Negotiations ensued between Swift Air and Saipan Air. On March 29, Conry initiated a conference call with Ferguson and the sales director of International Lease Finance Corporation ("ILFC") to ensure that two Boeing 757 aircraft would be available for Swift Air's July 1 launch. (*Id.* ¶ 14.) According to Ferguson, it was understood that a $700,000 deposit with ILFC would be required. (*Id.*) Conry and Van Lier represented to Saipan Air that these deposits would be made. (*Id.* ¶ 17.)

In early April, Van Lier initiated phone calls and e-mails representing that roughly $1.2 million in deposits were needed to secure aircraft for the Saipan Air program. (*Id.* ¶ 15.) According to Ferguson, Van Lier falsely represented that Saipan Air would lose aircraft to another carrier if the deposits weren't made immediately. (*Id.*)

On April 6, 2012, Saipan Air and Swift Air entered into the ACMI Agreement. Swift Air agreed to provide two Boeing 757-200s and one Boeing 737-400. (ACMI Agreement, Def. Ex. B, ECF No. 66-4.) Swift Air guaranteed that all aircraft would be in position in Saipan and fully airworthy by the delivery dates of June 28 (the 737 and one of the 757s) and July 29 (the other 757). (*Id.*, Appx. A, § 7.) Swift Air agreed that in the event of a delay, it would provide a Boeing 767 or equivalent as a backup. (*Id.* ¶ 4.11.)

On April 9, Tan Holdings Corporation, Saipan Air's parent, wired $900,000 into a Swift Air account in Arizona. (FAC, Ex. A, ECF No. 2-1.) According to Ferguson, Conry and Van Lier understood that $700,000 would be deposited with ILFC to secure the aircraft. (Ferguson Decl. ¶ 17.) They expressly represented that the remainder would be used for the Saipan Air program. (*Id.* ¶¶ 16, 17.) Conry and Van Lier dispute that there was any agreement with respect to allocation of the initial $900,000. (Conry Decl. ¶ 15; Van Lier Decl. ¶ 13.) Only $176,000 was

4

1  transferred to ILFC. (Conry Decl. ¶ 16; Van Lier Decl. ¶ 16.) Saipan Air did not learn of this

2  until May 17. (Ferguson Decl. ¶ 19.)

3      In telephone conversations over the next few weeks, Conry and Van Lier assured

4  Ferguson that Saipan Air's launch was on track for July 1 and that the airplane deposits were

5  made to ILFC. (*Id.* ¶ 18.)

6      Under the ACMI Agreement (¶ 4.5), Swift Air agreed to ensure that adequate spare parts

7  would be available at Saipan's airport to service the aircraft. Shane Nail, who was in charge of

8  maintenance manuals for Swift Air, testified that he was unaware of any parts ordered and

9  earmarked for Saipan between March and June 2012. (Nail Depo. 36:3–9.) The maintenance

10 department was not asked to prepare maintenance manuals for a Boeing 757. (*Id.* 37:2–8.) Swift

11 Air did not acquire parts for 757s. (*Id.* 39:13–16.)

12     Swift Air had leased a Boeing 737 from Jim Rogers, chief executive officer of Flair Air.

13 (Rogers Decl. ¶¶ 1, 2.) On or about May 15, 2012, Conry and Van Lier contacted Rogers about

14 the status of the 737. (*Id.* ¶ 5.) This was the first time Rogers had heard of the Saipan Air

15 program. (*Id.* ¶ 3.) The 737 was due for a compulsory inspection that would take 28 to 35 days to

16 complete. (*Id.* ¶ 4.) Rogers told Conry and Van Lier he would not permit Swift Air to use the 737

17 for the Saipan Air program. (*Id.* ¶ 5.) Sometime after May 15, Van Lier and Conry falsely

18 represented to Ferguson that Rogers's 737 was available. (Ferguson Decl. ¶ 22.)

19     On or about May 23, 2012, Conry and Van Lier asked Saipan Air to provide a letter of

20 credit in favor of ILFC to secure the two 757s. (Ferguson Decl. ¶ 24.) Conry represented that

21 Swift Air was still on track to meet the Saipan Air launch date. (*Id.*) Saipan Air supplied a letter

22 of credit in the amount of $524,000, the balance of the required $700,000 deposit. (*Id.*)

23

24

1    Also on or about May 23, Conry and Van Lier pleaded for an additional $376,000 in

2   cash in order to remain viable and complete the Saipan Air program by the launch date. (*Id.* ¶

3   25.) In reliance on their false representations that the promised aircraft or substitute aircraft

4   would be available on the launch date, Saipan Air had Tan Holdings wire $376,000 to Swift

5   Air's account. (*Id.* ¶ 26; FAC, Ex. B, ECF No. 2-2.) These funds were earmarked for use in the

6   Saipan Air program. (Stukes Depo. 115:8.)

7    On or about May 31, Conry telephoned Ferguson and said Swift Air needed a $1.5

8   bridge loan in order to meet the Saipan Air launch date. (Ferguson Decl. ¶ 29.) He represented to

9   Ferguson that the 737 and substitute 767 were available. (*Id.*) He advised Ferguson that Stukes

10  would be calling about the bridge loan. (*Id.*) Conry identified Stukes as an independent financial

11  advisor hired by Swift Air. (*Id.*) He did not divulge that Stukes was a minority owner of Swift

12  Air and had a pecuniary interest in the company. (*Id.*) Nor did Stukes himself disclose this

13  interest. (*Id.* ¶ 30.) During subsequent negotiations for a bridge loan, Stukes represented that the

14  $1.5 million would allow Swift Air to perform on its contract with Saipan Air, even though at the

15  time he already knew that there were serious problems with Swift Air's financial operation.

16  (Stukes Depo. 123:6–14.) The negotiations for a bridge loan were unsuccessful. (FAC ¶ 32.)

17    On July 24, 2012, Saipan Air received a letter from Van Lier terminating the ACMI

18  Agreement. (Ferguson Decl. ¶ 28.) On July 27, Swift Air filed for bankruptcy protection under

19  chapter 11. *In Re Swift Air, LLC,* 2:12-bk-14362-DPC (D. Ariz.).

20              **III.    LEGAL STANDARD**

21    A court must grant summary judgment if there is no genuine issue of material fact for

22  trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

23

24                          6

movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party on the evidence presented; a mere "scintilla of evidence" is not sufficient. *Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.*

The court views the evidence in the light most favorable to the non-moving party and draws "all justifiable inferences" in that party's favor. *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999)). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989) (quoting *Angel v. Seattle-First Nat'l Bank,* 653 F.2d 1293, 1299 (9th Cir. 1981)).

In a diversity action raising state law claims, the substantive law of the forum state

7

applies. *See Medical Lab. Mgmt. Consultants v. ABC,* 306 F.3d 806, 812 (9th Cir. 2002). "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.,* 615 F.2d 857, 861 (9th Cir. 1980). "When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Kona Enters., Inc. v. Estate of Bishop,* 229 F.3d 877, 885 n. 7 (9th Cir. 2000) (quoting *Aetna Cas. & Sur. Co. v. Sheft,* 989 F.2d 1105, 1108 (9th Cir. 1993)). In the absence of controlling precedent from the state's highest court, a court may "look to other state-court decisions, well-reasoned decisions from other jurisdictions, and any other available authority to determine the applicable state law." *Burns v. Int'l Ins. Co.,* 929 F.2d 1422, 1424 (9th Cir. 1991). "When there is no dispositive Commonwealth authority on an issue, we may look to persuasive authority from other jurisdictions." *Commonwealth v. Lot No. 353 New G,* 2012 MP 6 ¶ 16 (N. Mar. I. 2012). Rules of the common law, including the Restatements, "shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary." 7 CMC § 3401.

## IV.   DISCUSSION

### A.   Evidentiary Objections

In their Reply (pp. 1–3), Defendants objected to some of Saipan Air's proffered evidence. Saipan Air has not filed a response to the objections, and did not address the objections at the October 30 hearing. On a motion for summary judgment, the trial court may consider only evidence that would be admissible at trial. *Orr v. Bank of Am.,* 385 F.3d 765, 773 (9th Cir.

2002); Fed. R. Civ. P. 56(c)(2). The court focuses on the admissibility of the contents, not on whether the nonmoving party has presented the evidence in a form that would be admissible. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

Defendants object to some of the characterizations of the evidence by opposing counsel, in Saipan Air's opposition brief, as distortions of sworn witness statements and deposition testimony. For example, Saipan Air asserts, "Van Lier expressly represented to Saipan Air that Avondale was infusing US$70.0 million in Swift Air," and cites to ¶ 7 of Ferguson's declaration. (Opp'n, pp. 7–8.) In ¶ 7, however, Ferguson is talking about Conry, not Van Lier, and only goes so far as to say that Conry "falsely stated that Avondale Ventures represented a portfolio of US$70.0 million in assets." When Ferguson does talk about Van Lier, in ¶ 10, he asserts that "Van Lier falsely represented that Swift Air was supported by a fund which had US$70.0 million in its portfolio owned by Avondale Ventures." Support by a $70 million fund is different from an infusion of $70 million in cash.

This is not really an objection to admissibility, but Defendants' point is well taken. The Court is aware that summaries of the evidence in the parties' briefs are not themselves evidence, and is mindful to examine the actual evidence in the record with respect to the allegations in the FAC.

Defendants object to the use of deposition testimony cited by Saipan Air but not included in the deposition excerpts attached to the opposition brief. At the hearing, Saipan Air's counsel acknowledged that some of the excerpts were missing and that the Court may not be able to consider allegations unsupported in the record. Saipan Air has not supplemented the record since the hearing. Where the evidence is not in the record, the Court will not consider it.

1    Defendants object to LeRoux's deposition testimony that she felt Van Lier was lying to

2  Ferguson when he told Ferguson the aircraft would be ready by Saipan Air's start date, that in

3  her "heart of hearts" she knew the aircraft would not be ready, and that she had heard the planes

4  hadn't been painted. (LeRoux Depo., pp. 29–30, 43–44.) Although what LeRoux overheard Van

5  Lier say about the aircraft would be admissible as the admission of a party opponent, what she

6  heard other unidentified individuals say would not be exempt from the hearsay rule. So the

7  objection to testimony about the planes' not being painted is sustained. The Court finds sufficient

8  foundation for LeRoux to give an opinion as to whether Van Lier was being truthful in his

9  assessment of whether the planes would be ready on time. LeRoux was involved in the Saipan

10  Air project. She traveled to Saipan with Van Lier in January 2012. (*Id.*, p. 30.) She worked in the

11  "in-flight" department and was preparing manuals for use in the Saipan Air program. (*Id.*, p. 44.)

12  She would be in a position to form an opinion as to whether Swift Air was making reasonable

13  progress toward fulfilling its commitment to provide planes by the start date.

14    B.    Damages

15    Defendants assert that all three of Saipan Air's claims must fail because Saipan Air

16  cannot show it suffered damages. Fraudulent misrepresentation requires a showing of detrimental

17  reliance. *Syed v. Mobil Oil Mariana Islands, Inc.,* 2012 MP 20, ¶ 44 (N. Mar. I. 2012). To make

18  out a RICO claim, a plaintiff must show that defendant's misconduct caused injury to the

19  plaintiff's "business or property." *Grimmett v. Brown,* 75 F.3d 506, 510 (9th Cir. 1996) (citing

20  18 U.S.C. § 1964(c)). An element of a claim of unjust enrichment is that the defendant was

21  enriched at the plaintiff's expense. *Syed,* 2012 MP 20, ¶ 41. According to Defendants, the alleged

22  damages were suffered not by Saipan Air but by its parent, Tan Holdings. (MSJ Memo, p. 12.)

23

24                                                      10

The wire transfers to Swift Air came directly from a Tan Holdings account. Tan Holdings supplied the cash to replace the $524,000 letter of credit, and wrote the checks that paid for Saipan Air's advance marketing efforts, renovation of airport facilities, purchase of supplies, and hiring of new employees. (Ferguson Depo., pp. 77, 79, 86–88.)

Saipan Air has established a genuine issue of material fact as to who was damaged. Ferguson testified that the money was loaned to Saipan Air by Tan Holdings. (Ferguson Depo., pp. 87, 88.) Glicerio Arago, corporate secretary of Saipan Air and senior vice president of Tan Holdings, states in a sworn affidavit that Tan Holdings advanced funds to Saipan Air "with the express understanding that these funds would be reimbursed to Tan Holdings when Saipan Air began its actual operations." (Arago Decl. ¶ 7.)

Even without this evidence of a debt, Saipan Air can satisfy what Defendants call the "damage" element of at least the fraud and RICO claims. If Saipan Air was thwarted from beginning air service, accepting paying customers, and making good on its obligations to business partners in China and Japan because of fraudulent representations that Swift Air would provide planes, it relied to its detriment. If a pattern of racketeering activity by Swift Air prevented Saipan Air from operating as a business, the business was injured.

C.    Fraud

In the CNMI, a plaintiff establishes fraudulent misrepresentation by showing "(1) a material, false representation by the defendant; (2) the defendant's knowledge of its falsity; (3) the defendant's intent that the plaintiff act reasonably upon it; and (4) the plaintiff's justifiable and detrimental reliance upon the misrepresentation." *Syed*, 2012 MP 20 ¶44. A misrepresentation is fraudulent if the maker "(1) knows or believes that the matter is not as he

11

represents it to be, (2) does not have the confidence in the accuracy of his representation that he

states or implies, or (3) knows that he does not have the basis for his representation that he states

or implies." *Benavente v. Marianas Public Land Corp.,* 6 N.M.I. 136, 145, 2000 MP 13 ¶ 31 (N.

Mar. I. 2000). Fraudulent misrepresentation must be proved by clear and convincing evidence.

*Boddy v. Guerrero,* 5 N.M.I. 117, 1997 MP 23 ¶¶ 8–9 (N. Mar. I. 1997).

### 1.   **Stukes**

Stukes is alleged to have made false representations only during negotiations beginning

May 31, 2012, for a $1.5 million bridge loan. (FAC ¶ 32.) Because the loan was never

consummated, Saipan Air cannot show detrimental reliance on or damages caused by those

alleged misrepresentations. Therefore, as to fraud, summary judgment must be granted in favor

of Stukes.

### 2.   **Conry and Van Lier**

Conry and Van Lier present similar arguments as to why summary judgment should be

granted in their favor. They assert that Saipan Air cannot make out the elements of fraud as to

any of the alleged misrepresentations. They sort the representations into three time periods: (1)

December 2011 and January 2012; (2) March through May 22, 2012; and (3) after May 22

through the termination of the ACMI Agreement in late June. (MSJ Memo, p. 22.)

#### a.   *December 2011–January 2012*

For the first period, Conry and Van Lier address three misrepresentations alleged in the

FAC: (1) that Conry told Ferguson that Avondale Ventures, which was purchasing Swift Air,

"had a US$70.0 million investor portfolio and that Avondale would be the primary source of

investment for Swift Air" (FAC ¶ 18); (2) that Conry "falsely told Adam Ferguson that he did

1    not know Defendant Stukes (*id.*); and (3) that Van Lier represented "that Swift Air could deliver

2    the aircraft required by Saipan Air" (FAC ¶ 21). Other accusations appear in Ferguson's sworn

3    declaration: that Van Lier, like Conly, represented that Swift Air was supported by Avondale's

4    $70 million portfolio (Ferguson Decl. ¶ 10; Opp'n, pp. 7–8), and that Conry falsely represented

5    he was the new "owner" of Swift Air (*id.* ¶ 6). Those allegations are not made in the FAC,

6    however, and Saipan Air has not moved to amend the FAC to include them, even though the

7    circumstances of an alleged fraud must be pled with particularity. *See* Fed. R. Civ. P. 9(b);

8    *Salameh v. Tarsadia Hotel,* 726 F.3d 1124, 1133 (9th Cir. 2013) (particularity requires complaint

9    to "identify the who, what, when, where, and how of the misconduct charged" (internal

10   quotations marks and citation omitted)). Conry and Van Lier must defend only against the

11   allegations in Saipan Air's complaint, not against other accusations that Ferguson or other

12   witnesses may have made in declarations and depositions.

13       Conry and Van Lier assert four reasons that the three allegations in the FAC do not

14   support a fraud claim. In the order in which the Court will discuss them, the reasons are: (1)

15   Saipan Air could not have justifiably relied in April 2012, when the ACMI Agreement was

16   signed, on stale representations made before initial discussions fell apart in mid-January; (2) the

17   representations relate to future events and are not actionable under CNMI law; (3) Ferguson

18   admitted in his deposition that the fraud did not begin until March 2012; and (4) Saipan Air

19   cannot show detrimental reliance on any representation that Conry did not know Stukes. (MSJ

20   Memo, pp. 22–23.)

21       Whether Saipan Air could have justifiably relied on the earliest representations hinges on

22   whether Saipan Air had a duty to investigate. As the defense put it, "Any suggestion that Saipan

13

1   Air could have reasonably relied on statements made prior to a two-month hiatus in the

2   relationship without conducting additional due diligence should fail as a matter of law . . ." (MSJ

3   Memo, pp. 22–23.)

4          Reasonableness and justifiability, however, are not the same. In a survey of the common

5   law of fraud in the fifty states, the United States Supreme Court found only five that required

6   reasonable reliance. *Field v. Mans,* 516 U.S. 59, 73 (1995). In the CNMI, as in the majority of

7   states, the standard is justifiable reliance. *See Syed,* 2012 MP 20 ¶44. In *Field,* the Supreme

8   Court explored the difference between reasonable and justifiable reliance. "[A] person is justified

9   in relying on a representation of fact 'although he might have ascertained the falsity of the

10  representation had he made an investigation.'" *Field,* 516 U.S. at 70 (quoting RESTATEMENT

11  (SECOND) OF TORTS (1976) § 540). "[A] defendant who has been guilty of conscious

12  misrepresentation can not offer as a defense the plaintiff's failure to make the investigation or

13  examination to verify the same." 1 F. Harper & F. James, LAW OF TORTS § 7.12, pp. 581–83

14  (1956), quoted in *Field,* 516 U.S. at 72. Plaintiff may not, however, turn a blind eye when a

15  representation's falsity would be apparent upon "cursory examination or investigation."

16  RESTATEMENT (SECOND) OF TORTS (1976) § 540, comment *a,* quoted in *Field,* 516 U.S. at 71.

17  Where plaintiff "has discovered something which should serve as a warning that he is being

18  deceived, . . . he is required to make an investigation of his own." W. Prosser, LAW OF TORTS §

19  108, p. 718 (4th ed. 1971), quoted in *Field,* 516 U.S. at 71.

20         Saipan Air's Ferguson has declared under oath that in December 2011, Conry falsely

21  represented to him "that Avondale Ventures . . . would be the primary source of investment into

22  Swift Air" and that Avondale "represented a portfolio of $70 million in assets." (Ferguson Decl.

23

24                                          14

¶ 7.) The circumstances in which the representation was made did not raise suspicion that it was false. Defendants have not cited to any cases or restatements of the law to support the proposition that a hiatus in negotiations creates a duty to investigate. Therefore, the Court concludes that as a matter of law as applied to these facts, it is possible that Saipan Air justifiably relied on early representations.

Defendants maintain that under CNMI law, representations relating to the occurrence of future events are not actionable in fraud. (MSJ Memo, p. 21.) In support, they cite to *Benavente v. Marianas Public Land Corp.* (N. Mar. I. 2000):

> To be actionable, the alleged false representation must relate to a past or existing material fact, not the occurrence of a future event. Fraud cannot be predicated on statements which are predicated on statements which are promissory in nature, or which constitute expressions of intent. An actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events. This is true even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such a promise.

6 N.M.I. 136, 145, 2000 MP 13 ¶ 33 (citation omitted).

Saipan Air responds that the *Benavente* rule has been limited by subsequent cases. (Opp'n, p. 19.) A cause of action in fraud may be maintained where, at the time the promise was made, the promisor did not intend to perform, or promised in reckless disregard of whether he or she could perform. *Fusco v. Matsumoto,* 2011 MP 17 ¶47 (N. Mar I. 2011) (citing *Del Rosario v. Camacho,* 2001 MP 3 ¶80 (N. Mar. I. 2001)).

Saipan Air is right. *Fusco* resolved a tension in CNMI case law between a broad rule prohibiting fraud actions based on promises of performance and a narrow rule permitting such

actions when the promisor never intended to perform.[2] *Fusco* expressly construed *Benavente* narrowly, as restating "the general rule that a cause of action for fraudulent misrepresentation cannot be based on a naked promise or a prediction of a future event." *Fusco,* 2011 MP 17 ¶49. "The fraudulent intent is a present existing material fact that serves as the basis for the cause of action." *Id.* ¶47. In *Fusco,* the Commonwealth Supreme Court permitted fraud claims to go forward where the defendant made promises he did not intend to keep, so as to induce one plaintiff to amend a ground lease and induce other plaintiffs to quitclaim certain land interests. *Id.* ¶¶8, 51–52. Saipan Air has produced sufficient evidence to create a genuine dispute as to whether, at the time the ACMI Agreement was executed, Conry and Van Lier had any intention to deliver on their promises of aircraft and services.

Although as a matter of law, Saipan Air could have justifiably relied on misrepresentations made by Defendants early in the negotiations, the evidence, when viewed in the light most favorable to the nonmoving party, does not support the conclusion that in fact Saipan Air so relied. E-mails exchanged between Ferguson and Van Lier show that in mid-January 2012, both parties to the negotiation doubted Swift Air could deliver service in time for Saipan Air's July launch. In particular, on January 19, Van Lier wrote to Ferguson:

> . . . I strongly doubt that we will be able to get the level of support [from the Federal Aviation Administration] conforming two additional aircraft and adding the 757 to Swift'[s] OPS SPECS. I remain convinced that internally we could be successful, but I am not willing to jeopardize your program in the event

---

[2] In January 2011, this Court noted that the *Benavente* rule was in tension with the formulation of fraud law in the RESTATEMENT (SECOND) OF TORTS § 530 (1977) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention."), and considered certifying a question to the Commonwealth Supreme Court. *See Kim v. Quichocho,* 763 F. Supp. 2d 1214, 1230 n.4 (Jan. 24, 2011). The decision in *Fusco,* issued later that same year, answered the question.

we are unsuccessful in accomplishing a full certification by June 15, 2012 due to a lack of FAA support.

　　　　　I thank you for your hospitality and patience and wish you success in the new venture.

 (ECF No. 66-4, p. 6.) Ferguson replied, "Thanks for your response Boris. Good luck with Swift Air." (*Id.*) Ferguson elaborated on this in his deposition: "[B]esides the emails, Boris and I talked several times about the ability or maybe the inability to be able to get the FAA to buy out from the program. . . . [W]e had concerns that they could actually complete any of it. So that's not when the fraud began." (Ferguson Depo. 42:10–14.) Defense counsel focused in on this point:

> MR. DUGGINS: So you would concede then that, at least in January of 2012, I think you've already said this, the fraud as you described it is not being perpetrated.
> MR. FERGUSON: Not that time, no.
> MR. DUGGINS: Okay. When did the fraud start?
> MR. FERGUSON: March.

(*Id*. 43:1–5.) The fact that Saipan Air's COO, the person to whom the allegedly false representations were made, does not think the fraud started until March is strong evidence that Saipan Air did not rely on the early representations.

　　　Saipan Air's evidence of detrimental reliance on false representations from the first round of negotiation is sparse. The only evidence that Avondale did not have a $70 million investor portfolio is Stukes's testimony that Avondale's net worth was approximately $3 million, and that Swift Air was aware of this. (Stukes Depo. 57:7–20; 77:9–12.) The usual sense of "net worth" is assets less liabilities. *See* BLACK'S LAW DICTIONARY 1845 (10th ed. 2014); *Sanders v. Jackson,* 209 F.3d 998, 1000 (7th Cir. 2000). There is no evidence that Swift Air misrepresented Avondale's assets, or that Avondale was not backing Swift Air. The problem, according to Ferguson's declaration, was that Swift Air had significant undisclosed debt (Ferguson Decl. ¶

13), and that Conry and Van Lier were "milk[ing] investors from their cash" (*id.* ¶ 31) by taking exorbitant salaries for themselves and maintaining lavish expense accounts (*id.* ¶ 32). The natural inference is that Conry and Van Lier failed to disclose facts, such as Swift Air's debts and their own inflated expenses, that bore on availability of Avondale's assets for use in the Saipan Air project.

Failure to disclose is at the heart of many of Saipan Air's allegations, including allegations that Conry hid Stukes's affiliation with Swift Air. "At all times relevant to this Complaint, Defendant Conry did not disclose to Saipan Air that Defendant Stukes was affiliated with Avondale and that he had an ownership interest in Swift Air. Defendant Conry falsely told Adam Ferguson that he did not know Defendant Stukes." (FAC ¶ 18.) Because this allegation is placed in the paragraph of the FAC that focuses on Conry's initial contact with Ferguson on December 12, 2011, Defendants consider it to relate to that period, and the Court will address it at this point.

There is no evidence in the record that Conry affirmatively represented he did not know Stukes. Ferguson does not so state in his sworn declaration or the excerpts of his deposition testimony in the record. The allegation in the FAC is not evidence, because the FAC is not verified. *Coverdell v. Dep't of Soc. & Health Servs., State of Wash.,* 834 F.2d 758, 762 (9th Cir. 1987). The evidence is that once the bridge loan discussions were underway in late May, Conry and Stukes did not disclose that Stukes had a pecuniary interest in Swift Air. (*See* Ferguson Decl. ¶¶ 29, 30.) Generally, concealment of material facts may satisfy the first element of fraudulent misrepresentation only when the defendant had a duty to disclose such facts, whether because of a fiduciary relationship or because defendant has superior knowledge not reasonably available to

the plaintiff. *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.,* 406 F.3d 1052, 1064 (8th Cir. 2005) (under Missouri law); *Gen. Signal Corp. v. MCI Telecommunications Corp.,* 66 F.3d 1500, 1511 (9th Cir. 1995) (under New York law). Saipan Air has not pled fraudulent concealment, and the parties have not raised it in their briefs on the summary-judgment motion. Conry and Stukes did not stand in a fiduciary relationship with Saipan Air during the initial negotiations or have special knowledge not reasonably available to Saipan Air. Moreover, the fact of Stukes's interest was not relevant until Stukes became involved in the bridge loan negotiations in late May 2012. Therefore, Saipan Air cannot show detrimental reliance on this omission.

Saipan Air has not pointed to any substantial evidence that it relied on the early representations when it decided to enter into the ACMI Agreement and send a security deposit in April 2012, or when it wired cash to Swift Air a second time in late May. The Court therefore finds that evidence of detrimental reliance on the early representations is not such that a reasonable jury might determine that fraud was proved with convincing clarity. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986); *Sischo-Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1110 n.10 (9th Cir. 1991), *superseded by statute on other grounds* (when substantive claim requires proof by clear and convincing evidence, on motion for summary judgment court must take heightened evidentiary standard into account).

b.    *March through early May 2012*

The misrepresentations allegedly made by Conry and Van Lier during renewed negotiations leading to the ACMI Agreement and first wire transfer are as follows: (1) "On or about March 16, 2012, Defendants Van Lier and Conry represented to Ferguson that they could

1    meet Saipan Air's scheduled launch date on July 1, 2012" (FAC ¶ 22); (2) on or about March 21,

2    Conry and Van Lier showed Ferguson financial statements that "showed that Swift Air had

3    virtually no debt" (FAC ¶ 23); (3) also on or about March 21, they repeated their representation

4    that Avondale had $70 million in assets that "would be used to support Saipan Air's program";

5    (4) on or about April 6, Van Lier "falsely told Adam Ferguson that Saipan Air would lose

6    aircraft to another carrier unless the funds were wired immediately" (FAC ¶ 26); (5) on or about

7    April 9, Saipan Air caused $900,000 to be wired to a Swift Air account in express reliance on

8    false representations by Conry and Van Lier that $700,000 would be paid to ILFC to secure three

9    aircraft and the remaining $200,000 would be used to pay for Saipan Air program services and

10   materials (FAC ¶ 28–29). The fact that these representations were made is supported in the

11   record, to one degree or another, by Ferguson's sworn statement. (Ferguson Decl. ¶¶ 13–19.)

12        Defendants assert that these allegations cannot survive summary judgment for four

13   reasons. First, they maintain that any representations as to future ability to perform are not

14   actionable in fraud under the *Benavente* rule; alternatively, evidence of Defendants' efforts to

15   fulfill their obligations under the ACMI Agreement show they intended to perform. (MSJ Memo,

16   pp. 23–24.) As we have seen, however, *Benavente* has been limited by *Fusco,* and fraud claims

17   as to promises of future performance may be maintained where there is evidence the promisor

18   did not intend to perform at the time the promise was made. Whether Defendants' efforts were

19   sincere or half-hearted may reasonably be disputed and is best left to the jury to decide.

20        Second, Defendants assert that the claim of fraud as to how the $900,000 security deposit

21   was used is barred by the ACMI Agreement's integration clause. (MSJ, p. 24.) That clause states

22   that the ACMI Agreement and its appendixes "constitute the entire agreement between the

23

24                                               20

parties and supersedes any prior agreement or understanding, written or unwritten, regarding the

subject matter hereof." (ECF 66-4, Ex. B, ¶ 11.1.) Paragraph 8 of the ACMI Agreement requires

Saipan Air to make a security deposit of $900,000 but does not say what Swift Air is to do with

the cash. Saipan Air responds that Ferguson's testimony as to the parties' understanding of how

the $900,000 would be used is admissible for the purpose of showing fraud. (Opp'n, p. 20.)

The parol evidence rule, as applied in the CNMI, "is a rule of substantive law which

excludes evidence of prior or contemporaneous agreements or negotiations to change or modify

the terms of a binding integrated agreement." *Del Rosario v. Camacho,* 6 N.M.I. 213, 2001 MP 3

¶ 68 (N. Mar. I. 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS (1981) § 213, 215).

"Agreements or negotiations prior to or contemporaneous with the written agreement are

admissible . . . to show . . . other invalidating causes, such as fraud or lack of consideration[.]"

*Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS (1981) § 214). The majority of jurisdictions

read this exception broadly to admit extrinsic evidence of fraud "even though it conflicts with the

terms of the integrated written instrument." *Touche Ross Ltd. v. Filipek,* 778 P.2d 721, 728

(Haw. App. 1989). Even California, which had limited the fraud exception to evidence showing

"some fraud in the procurement of the instrument or some breach of confidence concerning its

use," *Bank of America etc. Ass'n v. Pendergrass,* 48 P.2d 659, 661 (Cal. 1935), has now adopted

the majority view. *See Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit

Ass'n,* 291 P.3d 316 (Cal. 2013) (expressly overruling *Pendergrass*).

A broad reading of the fraud exception aligns with precedential authority in the CNMI. In

*Lifoifoi v. Lifoifoi-Aldan* (N.Mar. I. 1996), the Commonwealth Supreme Court allowed parol

evidence to show that the grantor of a deed of gift that expressly left a parcel of land to the

21

1   grantor's daughter intended that her son and daughter would divide the land equally. 5 N.M.I. 1,

2   1996 MP 14. The son alleged that his sister had fraudulently procured the deed of gift from their

3   mother. *Id.* ¶ 25. He sought to admit a written "Deklarasion" by the mother of her intention that

4   the children share equally in any land transfers. *Id.* ¶ 25. The Commonwealth Supreme Court

5   held that the Deklarasion was admissible, not to show what the mother thought she was doing

6   when she signed the deed, but "in support of [the son's] broader theory that as a result of [the

7   daughter's] fraudulent or otherwise wrongful conduct, his share of the interest in the land was

8   never transferred to him . . ." *Id.* ¶ 21. Likewise, Saipan Air is offering extrinsic evidence not to

9   prove the parties' intentions as to the security deposit and to vary that term of the ACMI

10  Agreement, but in support of its grand theory that the Agreement was a ruse to siphon large

11  amounts of cash away from Saipan Air and into Defendants' pockets. For that purpose, under

12  CNMI law, Ferguson's testimony is not barred by the parol evidence rule.

13       Third, Defendants assert that Saipan Air has not come forward with evidence to show

14  that the financial statements they provided Ferguson were false and that they knew them to be

15  false. (MSJ Memo, pp. 24–25.) The evidence that Saipan Air has pointed to in their opposition

16  brief is Ferguson's sworn statement that (1) when he went to Phoenix he asked to see full and

17  complete financial records of Swift Air but was told by Conry and Van Lier that they were not

18  available; (2) he was shown only unaudited pro formas, and the pro formas "indicated that Swift

19  Air had very little debt"; and (3) Conry and Van Lier concealed liabilities, including a $1.6

20  million tax lien against Swift Air and a $900,000 judgment for nonperformance of a contract.

21  (Ferguson Decl. ¶ 13.) Conry and Van Lier deny that Ferguson asked to see any financials other

22  than pro formas or that they were unprepared to provide other financial statements. (Conry Decl.

¶ 9; Van Lier Decl. ¶ 9.) They assert that Saipan Air could not have justifiably relied on pro formas without doing their due diligence (Memo MSJ, p. 25), but cite to no law in support of that proposition. As to debts, they do not deny the tax liability – after the first wire transfer had been made, Van Lier sent Ferguson an e-mail attachment showing over $1.7 million owed in federal transportation taxes (*see* Ferguson Depo. 59:21–60:2) – but dispute precisely when these debts were disclosed and whether they materially affected Saipan Air's business decisions. Clearly, there is a dispute as to material facts surrounding the conclusion of the ACMI Agreement and the two wire transfers.

Fourth, Defendants assert that Saipan Air has not produced evidence to show that Avondale would not support its program. (MSJ Memo, p. 25.) The allegations in the FAC, however, are that Conry and Van Lier grossly and intentionally overstated Avondale's financial ability to provide adequate support. For that proposition, there is a genuine issue of material fact.

For these reasons, the Court finds that Saipan Air has set forth specific facts showing that there is a genuine issue for trial as to whether, after negotiations resumed in March, Conry and Van Lier knowingly made material misrepresentations that fraudulently induced Saipan Air to enter into the ACMI Agreement and pay the $900,000 security deposit.

c.    *Mid-May through June 2012*

It is alleged and admitted that on or about May 23, 2012, Conry asked Saipan Air to provide a $524,000 letter of credit to ILFC. (FAC ¶ 30; Answer ¶ 30.) It is also undisputed that on May 29, Swift Air caused $376,000 to be wired to Swift Air. (*Id.*) Saipan Air alleges that the $376,000 wire transfer came about after Conry and Van Lier told Ferguson they required the additional cash to ensure the promised aircraft were fully certified and available. (FAC ¶ 30.)

23

1    Saipan Air alleges that it provided the letter of credit and the cash upon the false representations

2    of Conry and Van Lier that Swift Air was on track for the July 1 launch date. (*Id.*) According to

3    Ferguson, he had learned on May 17 that only $176,000 of the initial security deposit had been

4    deposited for the ILFC 757s, and that Van Lier and Conry apologized for this. (Ferguson Decl. ¶

5    19.) In support of the allegation that Van Lier and Conly knowingly misrepresented the aircrafts'

6    availability, Ferguson states that he subsequently learned (1) that the contractor responsible for

7    conformity of the 757s had walked off the job for nonpayment of work performed (*id.* ¶ 20); (2)

8    that the 737 which Conry and Van Lier had represented was available for Saipan Air was in fact

9    scheduled for a heavy maintenance check, and on May 15 its owner had told Conry and Van Lier

10   he would not permit it to be used for Saipan Air (*id.* ¶ 22; Rogers Decl. ¶ 5); and that the backup

11   767 was flying for a different company, EZJet (*id.* ¶ 23). Stukes testified that he told Conry the

12   767 had to be pulled from EZJet and given over to Saipan Air. (Stukes Depo. 151:4–11.)

13       Defendants assert three reasons that Saipan Air cannot prove justifiable reliance on their

14   representations about the aircrafts' availability. (MSJ Memo, pp. 25–27.) The Court has already

15   rejected one of those reasons: that representations concerning future performance are not

16   actionable. (*See* Part IV.C.2.a, *supra*.) Further, on May 22, Defendants provided Ferguson with

17   updated financial statements that showed the deterioration of Swift Air's financial position, and

18   Ferguson reviewed them before May 29. This appears to be so. (Ferguson Depo. 59:8–60:6.) But

19   Saipan Air is not alleging that, at this stage, Defendants misrepresented Swift Air's health.

20   Saipan Air complains, in fact, that from May 24 to May 27, Conry called Ferguson several times

21   and pressed Saipan Air for a bridge loan of $1.5 million because Swift Air was out of cash and

22   the start date was at risk. (FAC ¶¶ 31–32.) Saipan Air was aware Swift Air was in financial

23

24                                                24

trouble. What they needed to hear from Conry and Van Lier, barely a month before the July 1 launch in which Saipan Air had invested heavily, was whether Swift Air could still deliver the planes.

Saipan Air's most compelling argument against justifiable reliance is that by May 22, Ferguson had concluded that Van Lier and Conry were liars. (Ferguson Depo. 60:18–20.) This is a variation on the adage "Fool me once, shame on you; fool me twice, shame on me." To test this theory, one must return to the meaning of justifiable reliance. It is said that reliance is justifiable if it "was reasonable under the surrounding circumstances." *Lawyers Title Ins. Corp. v. Baik,* 55 P.3d 619, 626–27 (Wash. 2002) (en banc); *see Nichols v. Califano,* 556 F.2d 931, 933 (9th Cir. 1977) (equating "justifiable" with "reasonable under the circumstances"). Here, the circumstances include that Saipan Air was already committed to the fast-approaching July 1 launch date, and had already partnered with Swift Air to achieve it. If Swift Air failed from underfinancing, that would likely scuttle the rollout plans and cause Saipan Air a substantial loss. As Ferguson put it in his deposition, "[W]e've already pulled the triggers. Either just pull back all together or just see if we can get this thing to work." (Ferguson Depo. 60:23–61:1.) Moreover, although Ferguson no longer trusted Conry and Van Lier, Saipan Air was "not aware that we're in the middle of a completely fraudulent deal up until that point." (*Id.* 61:1–2.) Saipan Air has produced sufficient admissible evidence to try this question to the jury.

D.   RICO

To prevail on its § 1962(c) RICO claim, Saipan Air must prove "(1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Turner v. Cook,* 362 F.3d 1219, 1228 (9th Cir. 2004); *see Sedima SPRL v. Imrex Co. Inc.,* 473 U.S. 479, 496 (1985). The alleged

1    predicate acts of racketeering activity are mail and wire fraud, in violation of 18 U.S.C. §§ 1341
2    and 1343.

3         In the MSJ, Defendants contest only one prong of the RICO claim. They assert that
4    Saipan Air has failed to present evidence showing that any of them engaged in a "pattern" of
5    racketeering activity. (MSJ Memo, p. 14.) A pattern must include at least two predicate acts
6    within ten years of one another. *Turner,* 362 F.3d at 1229 (citing 18 U.S.C. § 1961(5)). In
7    addition, the racketeering predicates must be related and must "amount to or pose a threat of
8    continued criminal activity." *Id.* (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229,
9    239 (1989)). Relationship and continuity "are distinct requirements[,]" *H.J. Inc.,* 492 U.S. at 242,
10   although "in practice their proof will often overlap." *Id.* at 239. Predicate acts are related if they
11   have "the same or similar purposes, results, participants, victims, or methods of commission, or
12   otherwise are interrelated by distinguishing characteristics and are not isolated events." *United*
13   *States v. Bingham,* 653 F.3d 983, 992 (9th Cir. 2011) (quoting *H.J. Inc.,* 492 U.S. at 240).
14   Continuity may be either "closed-ended" or "open-ended." A party alleging closed-ended
15   continuity must prove "a series of related predicates extending over a substantial period of time"
16   – typically, more than "a few weeks or months." *Turner,* 362 F.3d at 1229 (quoting *H.J. Inc.,*
17   492 U.S. at 241). Open-ended continuity requires a showing that the form of predicate
18   misconduct "by its nature projects into the future with a threat of repetition." *Id.*

19        Defendants assert that Saipan Air's evidence fails to satisfy the continuity requirement.
20   (MSJ Memo, p. 15–20.) They argue that the time span over which the predicate acts occurred –
21   seven months at most – is too short to establish close-ended continuity; and that the allegations
22   do not support open-ended continuity because the scheme had a definite end point – the July 1

23

24                                          26

launch date – with no threat of continuing racketeering activity.

With respect to the alleged scheme to defraud Saipan Air, the evidence does not show the necessary continuity. The scheme was closed-ended: Defendants would have to squeeze as much cash out of Saipan Air as it could by July 1, the date on which it was bound to perform under the ACMI Agreement. There was no threat that racketeering activity would continue past that date. Any chance of getting more money from Saipan Air would evaporate if Swift Air failed to deliver the aircraft on time; and if Swift Air did deliver, there would be no predicate fraud. Moreover, the several months (December 2011 to June 2012) over which the allege scheme was perpetrated is too short a period for open-ended continuity. Although there is no "hard and fast, bright line" rule, *Allwaste Inc. v. Hecht,* 65 F.3d 1523, 1528 (9th Cir. 1995), generally a pattern of activity "lasting only a few months" and "less than a year, . . . does not reflect the long term criminal conduct to which RICO was intended to apply." *Religious Technology Center v. Wollersheim,* 971 F.2d 364, 366–67 (9th Cir. 1992) (six-month pattern insufficient). Saipan Air has not distinguished the facts of this case from run-of-the-mine failed RICO cases with a pattern of activity spanning only several months.

Saipan Air's response to Defendants' attack on the pattern prong is limited to one sentence, in reliance on the entire deposition of Gregg Lukenbill: "Defendants Stukes and Conry have engaged in a pattern of fraudulent activities over the course of the past several years. (Lukenbill Depo.)" (Opp'n, p. 26.) Gregg Lukenbill is an aggrieved airline executive who, judging from his deposition testimony, believes Defendants and others defrauded him out of his interest in Sky King, Inc., which flew airplanes for Direct Air, a company now in bankruptcy. Lukenbill played no role in Saipan Air or Swift Air. It appears, then, that Saipan Air is conceding

that Van Lier did not engage in a pattern of racketeering activities, and is counting on alleged fraudulent acts against a different victim in order to establish open-ended continuity. Defendants object to this theory. They assert that the RICO scheme expressly alleged in the FAC is limited to acts directed against Saipan Air and committed between December 12, 2011, and June 24, 2012. (Reply, pp. 7–8; FAC ¶ 3.)

The circumstances in which a RICO claim can establish continuity through predicate acts not directed against the plaintiff are narrow. "Plaintiff may not complain about conduct which did not harm him under the guise of RICO continuity, unless those improper acts directed toward others are functionally related to the acts which harmed the plaintiff." *Vild v. Visconsi,* 956 F.2d 560, 569 (6th Cir. 1992). The types of conduct must be similar, and the victims must be "essentially in the same position." *Id.* at 570. Neither in its one-sentence reply, nor in oral argument at the hearing, has Saipan Air made the requisite showing. Furthermore, Defendants are right to complain that the FAC did not clearly set forth predicate acts against Lukenbill and Sky King. The only mention of other acts is that Conry and Stukes have been involved in other airline ventures, including Sky King, that ended in bankruptcy and, in one instance, civil RICO claims. (FAC ¶ 19.) No details are given. Moreover, the purpose of that paragraph is not to assert other predicate acts, but to show that Conry lied when he denied he knew Stukes. (FAC ¶ 18.) For these reasons, the Court finds that Saipan Air cannot establish continuity by reference to alleged fraudulent acts against other persons and entities.

Because Saipan Air has not come forward with evidence to show a pattern of racketeering activity, summary judgment will enter in favor of all Defendants on the RICO claim. It is unnecessary, therefore, to consider Defendant Stukes's alternative argument that the

28

1    evidence does not show that he directed the affairs of the alleged racketeering enterprise. (Reply,

2    p. 4.)

3         E.    Unjust Enrichment

4         Defendants assert that as a matter of law, Plaintiff cannot show that they were unjustly

5    enriched by the two wire transfers totaling $1.27 million. (MSJ Memo, pp. 27–29.) "To prove a

6    claim for unjust enrichment, a claimant must show: (1) the defendant was enriched; (2) the

7    enrichment came at the plaintiff's expense; and (3) equity and good conscience militate against

8    permitting the defendant to retain what the plaintiff seeks to recover." *Syed,* 2012 MP 20 ¶ 41.

9    There is no dispute that in the two transactions the cash was wired into a Swift Air account, not a

10   personal account belonging to one of the Defendants. Nor is it alleged that Defendants

11   embezzled the money from Swift Air. Rather, Saipan Air alleges that the funds it gave Swift Air

12   were used to support Defendants' exorbitant (in Saipan Air's view) salaries and to reimburse

13   Defendants' allegedly inflated expense reports. (Opp'n, pp. 22–23.) Defendants contend that the

14   unjust enrichment claims fails because (1) the benefit was conferred on the corporation, not on

15   them personally; and (2) CNMI law does not recognize a quasi-contract claim for unjust

16   enrichment and the wire transfers were covered by a contract, the ACMI Agreement.

17        Starting with Defendants' second argument, this Court has determined that the

18   Commonwealth would adopt "the well-settled rule that a quasi-contractual claim for 'restitution'

19   or 'unjust enrichment' will not lie where there exists a valid contract *between the parties*

20   covering the same subject matter." *Sin Ho Nam v. Quichocho,* 841 F. Supp. 2d 1152, 1175 (D. N.

21   Mar. I. 2011) (emphasis added); *accord Flores v. First Hawaiian Bank,* 2012 WL 2550593 (D.

22   N. Mar. I. Feb. 15, 2012). Saipan Air is not claiming that Swift Air, the other party to the ACMI

23

24                                                  29

1    Agreement, was unjustly enriched, but that individuals who were not parties to the contract were

2    so enriched. Saipan Air would not have a remedy in contract for Defendants' alleged

3    misconduct. So Commonwealth law does not foreclose the claim.

4         Defendants' other argument, that the benefit was not directly conferred on them, relies

5    on case law from a jurisdiction, Utah, that has a different test for unjust enrichment than the

6    Commonwealth. In Utah, to prevail on an unjust-enrichment claim, there must first "be a benefit

7    conferred on one person by another . . ." *Brumbelow v. Law Offices of Bennett and Deloney,*

8    *P.C.,* 372 F. Supp. 2d 615, 622 (D. Utah 2005) (quoting *Groberg v. Housing Opportunities, Inc.*

9    68 P.3d 1015, 1019 (Utah Ct. App. 2003)). In *Brumbelow,* plaintiff sued a debt collection agency

10   and its two individual shareholders for violations of the Fair Debt Collection Practices Act and

11   unjust enrichment. *Id.* at 617. The court granted summary judgment to the shareholders on the

12   unjust enrichment claim because "the benefit, if any, was conferred on the corporation, and not

13   the individual defendants." *Id.* The Commonwealth test does not expressly require the benefit to

14   have been directly conferred on the defendant. It is worth noting that the "benefit conferred" test

15   is criticized in the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT (2011) § 1

16   cmt. b, on which the Commonwealth Supreme Court has relied. *See Syed,* 2012 MP 20 ¶¶ 41–42.

17        And yet Commonwealth case law suggests that a direct line for the benefit from the

18   plaintiff to the defendant is needed. To prevail on an unjust enrichment claim, the plaintiff must

19   show that the defendant "received the disputed funds." *Olaitiman v. Emran,* 2011 WL 2680507,

20   2011 MP 8 ¶ 15 (N. Mar. I. 2011). In a deposition, defense counsel asked Ferguson what

21   evidence he had that Defendants received $1.8 million dollars from Saipan Air. (Ferguson Depo.

22   85:1–2.) Ferguson responded, "The contract is, speaks for itself . . ." (*Id.* 85:3.) The contract says

23

24                                                30

the funds go to Swift Air, and the documents confirm that's where they went. Saipan Air's

theory, as Ferguson put it in his deposition and as Plaintiff's counsel said repeatedly at the

hearing, is that Defendants "basically treated the company like an ATM," that they bled Swift

Air to death and "spen[t] money like it's going out of style." (*Id.* 85:5–7.) That might give Swift

Air – or the litigation trustee in the Swift Air bankruptcy – a cause of action against Defendants

to recover assets rightly belonging to the corporation, but it doesn't give Saipan Air an equitable

claim.

At the hearing, Plaintiff's counsel suggested that the claim could be sustained by veil

piercing. Saipan Air has alleged that Defendants "used Swift Air as a mere sham and shell to

defraud Saipan Air and otherwise operated this entity as their alter ego." (FAC ¶ 16.) In the

CNMI, "when the shareholders treat the corporation not as a 'separate entity' but rather as an

instrument to conduct their own personal business, the court may 'pierce the corporate veil' for

purposes of liability." *Dela Cruz v. Hotel Nikko Saipan, Inc.,* 5 N.M.I. 96, 1997 MP 16 ¶ 17 (N.

Mar. I. 1997). To pierce the corporate veil, a court must determine (1) "whether the interests of

the dominant stockholders are so intertwined with those of the corporation that separate entities

no longer exist," and (2) "whether injustice or fraud would result if the fiction of separate entities

was upheld. *United Enterprises, Inc. v. King,* 4 N.M.I. 304, 307 (N. Mar. I. 1995). A host of

factors must be examined, including but not limited to undercapitalization, failure to observe

corporate formalities, siphoning of corporate funds by dominant shareholders, and the extent of

the individual's control over the entity. *Id.*

Saipan Air has not gone beyond inflated rhetoric to actually demonstrate that, as a matter

of law and based on the evidence, Swift Air was the Defendants' alter ego. Saipan Air did not

make a motion to pierce the corporate veil. It did not mention veil piercing or the alter-ego

theory in its opposition brief. It has not pointed to evidence in the record to support a finding that

any of the factors necessary to veil piercing exists. The Court declines to undertake that

adventure on its own. Saipan Air's claim for unjust enrichment fails as a matter of law.

## V.    CONCLUSION

For the reasons set forth above, the Court rules as follows:

(1) On the claim of fraud, the Court GRANTS summary judgment in favor of Defendant

Stukes and DENIES summary judgment as to Defendants Conry and Van Lier.

(2) On the claim of violations of 18 U.S.C. § 1961 (RICO), the Court GRANTS

summary judgment in favor of all Defendants.

(3) On the claim of unjust enrichment, the Court GRANTS summary judgment in favor

of all Defendants.

SO ORDERED this 8th day of December, 2014.

RAMONA V. MANGLONA
Chief Judge

32